UNITED STATES of America,
Plaintiff-Appellee and
Cross-Appellant.

v.

Robert B. SUTTON, Sutton Investments,
Inc., Scurry Oil Company, BPM, Ltd.,
and Sooner Refining Company, Inc.,
Defendants-Appellants and Cross-Ap-
pellees.

Nos. 10–57, 10–58.

Temporary Emergency Court of Appeals.

Argued Oct. 21, 1985.

Decided June 11, 1986.

1042

George W. Bramblett, Jr., Charles C. Frederiksen, Eliot D. Shavin, Sharon N. Freytag of Haynes & Boone, Dallas, Tex., for appellant corporate defendants.

Mitchell B. Lansden, Baton Rouge, La., for appellant Robert B. Sutton.

Thomas C. Newkirk, Larry P. Ellsworth, Floyd I. Robinson, Marcia K. Sowles, Beth N. Mizuno, Rodney L. Solenberger, Patricia D. Graham, Erich T. Schwartz, of the Economic Regulatory Admin., Dept. of Energy, Washington, D.C., for appellee, U.S. of America;

Harold E. Kohn, Joseph C. Kohn, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for amicus curiae Philadelphia Elec. Co.

Philip P. Kalodner, Philadelphia, Pa., for amicus curiae Nat. Freight, Inc., RJG Cab Inc., and Geraldine H. Sweeney.

Alphonse M. Alfano, Robert S. Bassman, Douglas B. Mitchell, Bassman, Mitchell & Alfano, Washington, D.C., for amici curiae, the Petroleum Marketers Ass'n of America and the Jobbers' Group.

James F. Flug, Paula Dinerstein, Lobel, Novins & Lamont, Washington, D.C., for amicus curiae, the States of Ala., Cal., Conn., Idaho, Ill., Ind., Md., Mich., Miss., Mont., Ohio, Vt., Wis., Wyo., and N.Y.

Irwin I. Kimmelman, Atty. Gen. of N.J., Newark, N.J., and Jim Mattox, Atty. Gen. of Tex., Austin, Tex., for amici curiae "The Interested States."

Before GARZA, BROWN, and POINTER,* Judges.

WESLEY E. BROWN, Judge.

These appeals arise from an action for restitution filed in the Northern District of Oklahoma by the United States against defendant appellants Robert B. Sutton, Sutton Investments, Inc., BPM, Limited, Scurry Oil Company and Sooner Refining Company, pursuant to the provisions of Section 209 of the Economic Stabilization Act ("ESA"), as amended, 12 U.S.C. Sec. 1904 note, as incorporated in Section 5(a)(1) of the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. Sec. 754(a)(1).[1] The government alleged that the defendants, as resellers of crude oil, had, during the peri-

---

* Judge Pointer filed an opinion, attached hereto, concurring in part and dissenting in part.

1. The United States initially sought civil penalties under Section 208(b) of the Act as well as restitution, but dropped this claim prior to trial.

od of May, 1976 through January, 1981, miscertified their crude oil sales in violation of the provisions of 10 C.F.R. Secs. 212.131, 210.62(c), and 205.202.

Following a seven week trial before a magistrate and the district court, sitting without a jury, the trial court found that defendants had committed the miscertifications alleged and entered judgment against all defendants, jointly and severally for $423,050,902.92 in restitution to be paid to the United States for distribution to the states for use in energy related programs.[2] Although Robert Sutton acted in the names of the corporate defendants, the trial court held him to be jointly and severally liable with his corporations because the corporations were merely Sutton's alter egos. In addition, the court found that Sutton himself had engaged in tortious conduct, since he personally caused, or directed the illegal miscertifications.

Defendants appeal the trial court's finding of liability, and the amount of the award of restitution. In addition, they contend that the court erred in refusing to suppress all documents obtained by the government from a grand jury, allegedly in violation of Rule 6(e), Fed.R.Crim. Procedure. Defendants contend that the award to the government was in the nature of a penalty and not restitution, and as such it was barred by the statute of limitations and the doctrines of collateral estoppel and double jeopardy. Defendants also claim that the penalty nature of the claim entitled them to trial by jury, they claim that the certification regulations in question were invalid, and that the one-house legislative veto provisions of the EPAA and EPCA preclude the government's reliance on this legislation.

The United States has cross-appealed on two limited issues. The government claims that the district court erred in reducing the restitution award by excluding overcharges proved through use of certain documents obtained from a grand jury following Sutton's criminal trial in 1982, and by setting off Sutton's losses on some crude oil trades, against the total amount of overcharges.

By leave of court the Philadelphia Electric Company, National Freight, Inc., RJG Cab, Inc., Geraldine H. Sweeney, the Petroleum Marketers Association of America, the Jobbers' Group, and various States of the United States, have appeared as Amici Curiae. These parties have filed briefs presenting differing views as to the appropriate distribution of the restitution funds, without taking any position as to defendants' liability.

I. *The Chadha Issue*

Defendants have preserved their claim, previously raised in a Motion for Summary Judgment, that the EPCA and the EPAA contain unconstitutional legislative veto provisions, under the ruling in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Although defendants are aware of this court's decision reported as *Exxon Corp. v. United States Dept. of Energy*, 744 F.2d 98 (TECA 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515, they present the issue in this appeal "as there has been no definitive statement by the United States Supreme Court on this issue." The history of the veto provisions which appear within the Economic Stabilization Act of 1970, as well as Section 551, Section 552 of the Energy Policy and Conservation Act, 42 U.S.C. Sec. 6201, note, and our analysis of these provisions in terms of *Chadha*, have been discussed in the *Exxon* case and will not be repeated at this point. We find that we have jurisdiction of this appeal, and that the *Chadha* decision has no effect on any of the issues presented to us in this litigation.

**2.** The judgment of $423,050,902.92 included $210,736,532.92 in restitution and $212,314,369.00 in interest accumulated through August 31, 1984, plus interest of $132,315.97 per day for each day after August 31, 1984, through the date of Judgment, September 14, 1984, plus interest at 11.98% on the total judgment thereafter, pursuant to 28 U.S.C. Sec. 1961.

## II. Criminal Proceedings

Because of the nature of defendants' claim that the trial court erred in refusing to suppress all documents obtained by the government from the grand jury which returned a criminal indictment against defendants, it is necessary to review in some detail the criminal prosecution and pretrial matters pertaining to the civil litigation which is the subject matter of this appeal.

In October, 1981, a grand jury in the Northern District of Oklahoma returned a 17-count indictment against Robert B. Sutton, BPM, Ltd., and the Scurry Oil Company. The first 15 counts of this indictment were based upon the allegation that defendants were engaged in a fraud scheme whereby approximately 240 million barrels of crude oil were falsely certified under federal Mandatory Price Regulations. Counts 1, 2, and 3 charged violations of the anti-racketeering statutes; Counts 4 through 15 charged violations of the mail and wire fraud statutes; Count 16 alleged obstruction of justice in violation of 18 U.S.C. Sec. 1505 for attempting to destroy subpoenaed records, and Count 17 charged conspiracy to obstruct justice in violation of 18 U.S.C. Sec. 371 for attempting to prevent witnesses from testifying. At the close of the prosecution's evidence, the trial court found that the government had failed to meet its burden of proof on the first 15 counts, and a judgment of acquittal was entered on all of these counts. Upon application by the United States, a writ of mandamus staying entry of the judgment of acquittal was first granted by a three judge panel, *United States v. Ellison*, 684 F.2d 664, and then denied *en banc*, 722 F.2d 595 (10 Cir.1982).

Following remand by the Circuit, trial on the remaining Counts 16 and 17 continued.

The jury found defendant Robert B. Sutton guilty on Count 17—conspiracy to obstruct justice, but could not reach a verdict on Count 16. A mistrial was declared on that count, and a few weeks later Sutton was retried and convicted on Count 16. *United States v. Sutton*, 732 F.2d 1483 (10 Cir. 1984). Count 16 grew out of the destruction of BPM corporate records, after they had been subpoenaed in 1978 by the Department of Energy which was conducting an audit of defendants' business activities. The evidence at the criminal trial established that after the subpoena was served, Robert Sutton ordered all of his company records to be collected and moved into storage in Crowley, Louisiana. Shortly thereafter, all of these records were destroyed—by vandals—according to Sutton.[3] When Sutton learned one box of records had not been moved into storage, he ordered Gaylord Simon, a BPM employee to destroy it. Simon did not do so—he gave the box to Jack Clothier, Sutton's former business associate, and Clothier's attorney, William Lambert later surrendered the box in response to a grand jury subpoena. *United States v. Sutton, supra,* 732 F.2d at 1487–1488. This box, sometimes referred to as "The Box", and its contents of BPM invoices covering transactions of 1976 to 1978, were admitted as Exhibit 53 in the criminal trial, and as Exhibit PX1A in this restitution case. It has been previously determined that this box was properly authenticated and admitted into evidence at the criminal trial under the provisions of Rule 901(a) Fed.R.Evid. *United States v. Sutton, supra,* 732 F.2d at 1490.

The evidence on Count 17—conspiracy to obstruct justice—included taped conversations between Robert Sutton and one Carlos Marcello in which Sutton stated that he wanted Marcello to prevent Lambert and

---

3. In entering judgment for restitution in the instant case the trial court found that defendants, "through Robert B. Sutton attempted to destroy or cause to be destroyed certain of their books and records;" that Sutton "stated to his employees that the company's stored crude oil reseller records had been destroyed by either fire, flood and/or vandalism;" and that there "was no independent evidence offered such as photographs or insurance claims, etc. to corroborate the purported fire, flood, or vandalism." The trial court further found that the evidence "supports the conclusion that Robert B. Sutton personally saw to it that most of the defendants' crude oil reseller relevant records were destroyed or secreted." Findings of Fact (F/F) Nos. 29, 30, R. 26123).

Clothier from talking to the F.B.I. To prove motive, the government offered testimony that Sutton "had bought oil for which there was a ceiling price and sold it as oil for which there was no ceiling price." *United States v. Sutton, supra,* 732 F.2d at 1488.

III. *The Grand Jury Documents. Rule 6(e) Fed.R.Crim.Proc.*

Prior to institution of any criminal proceedings against Sutton and his companies, the Department of Energy attempted to investigate its suspicion that the defendant corporations, as crude oil resellers, had improperly certified crude oil which it had resold during the late 1970's. For this purpose, various administrative subpoenas were issued in an attempt to obtain defendants' records. When the grand jury investigation began in Oklahoma the administrative investigation was abandoned. Shortly after Robert Sutton was found guilty on Count 17 of the indictment on May 27, 1982, Assistant United States Attorney, James Swartz, one of the government's counsel in the criminal prosecution, addressed a letter under date of June 8, 1982, to Chief Judge H. Dale Cook of the United States District Court, Northern District of Oklahoma:

> This is to inform you that pursuant to the provisions of Rule 6(e) of the Federal Rules of Criminal Procedure, disclosure of materials subpoenaed by the grand jury presently sitting in session in the Northern District of Oklahoma is being made to the following additional named persons:
>
> (Then followed the names of one attorney and five auditors for the Department of Energy)

On July 15, 1982, a second letter was sent to Judge Cook advising that disclosure of materials subpoenaed by the grand jury was being made to six additional employees of the Department of Energy.

On October 5, 1982, the government filed what it terms an "Ex Parte Motion to Utilize in Civil Proceedings Documents Obtained by the Grand Jury." In discussing its particularized need for the grand jury material, the government made these allegations in this motion (R. 23,419):

> Documents collected during the course of the Grand Jury investigation are relevant to on-going investigations being conducted by the DOE pursuant to its civil enforcement authority. Copies of the documents have been provided to DOE agents as reflected in letters filed with the court pursuant to Federal Rule of Criminal Procedure 6(e). By this motion the Government seeks a formal order from the Court confirming the Department's authority to utilize these documents in civil enforcement proceedings. In accordance with the general rule of Grand Jury secrecy this motion is made ex parte and accompanied by the motion to seal, and the proposed form or order granting the motion provides that it and the moving papers shall remain under seal until further order of the Court.

In effect, the ex parte motion sought confirmation of the use of the documents in these present civil enforcement proceedings, actual access having been obtained four months earlier. On October 5, 1982, Judge Cook granted the government's motion, and directed that the grand jury documents otherwise remain under seal.

The United States then filed this civil action for restitution on November 9, 1982, claiming that defendants had violated the price regulations by miscertifying or failing to certify over 177 million barrels of crude oil, resulting in violations totalling more than $700 million. The defendants immediately moved to suppress documentary evidence used by the government in preparing the audit which was the basis of the action, claiming that DOE civil enforcement personnel had improperly gained access to the documents in violation of grand jury secrecy requirements of Rule 6(e) Fed.R.Crim. Procedure. The general rule of secrecy is set out in Rule 6(e)(2) which provides that parties to the proceedings, including attorneys for the government, shall not disclose matters except as provided by the rules, but that no obligation of secrecy may be

imposed on any persons except in accordance with the rule. Any knowing violation of Rule 6 may be punished as a contempt of court.

The exceptions to secrecy requirements are set out in Rule 6(e)(3):

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel ... as are deemed necessary by an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

(B) Any person to whom matters are disclosed under subparagraph (A)(ii) of this paragraph shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law. An attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made, . . . .

(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

(i) when so directed by a court preliminarily to or in connection with a judicial proceeding;

\* \* \* \* \* \*

If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

In an order of January 7, 1983 (R. 23,416) overruling defendants' motion to suppress, the trial court found that material which was made available during the criminal trial was no longer subject to Rule 6(e) secrecy provisions, and would therefore be admissible in civil litigation. As to other material procured from the grand jury, the court determined that the United States Attorney had no authority in June and July, 1982, to turn over grand jury material to DOE civilian enforcement personnel without obtaining a prior court order. However, although a violation of grand jury secrecy was found, the trial court believed that the government had acted in good faith and that the disclosure was not so "egregious" as to require suppression of the evidence. A decision on an appropriate sanction was then reserved for future decision.

Following the decision of the Supreme Court in *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), defendants renewed their motion to suppress the questioned grand jury material. From supplementary evidence added to the record, the trial court was able to find that 98% of the documents used by the government in preparing its civil restitution case had never been, or were no longer, protected by the secrecy provisions of Rule 6(e). Order of October 31, 1983, R. 24,255. In this respect, the court noted that apart from documents obtained by the government from sources other than the grand jury, some invoices previously presented to the grand jury were received in evidence as Exhibits 27 and 53 in the criminal trial of Robert B. Sutton, and as such, were no longer impressed with grand jury secrecy. Another large volume of documents obtained from the grand jury was used to reconstruct BPM records which had been destroyed, and these documents were used to prepare summaries of these records. These summaries were introduced as plaintiff's exhibits 80 and 81 at the criminal trial of Robert Sutton, pursuant to the provisions of Rule 1006, Fed. Rules of Evidence.[4] These doc-

---

4. Federal Rule 1006 provides that:

"The contents of voluminous writings, recordings, or photographs which cannot conve-

uments, although not admitted as exhibits during the criminal trial, were present in the courtroom for further examination in relation to admission of the summary exhibits, and they were produced and made available to defendants prior to commencement of the criminal trial. Under these circumstances, the trial court found that the reconstructed records of BPM were no longer impressed with secrecy because they had been produced at the criminal trial and had been used in preparing the summary exhibits which reflected and summed up the contents of all of these documents. The court also determined that while the remaining 2% of the documents used by the government in preparing its civil action remained subject to Rule 6(e) secrecy requirements, the evidence established that the government had acted in good faith and in reliance on existing case law which was subsequently overruled by the *Sells* decision.[5] The trial court again reserved judgment on the question of sanctions against the government until a later date. Order of October 31, 1983, *supra*, at R. 24,259.

On May 7, 1984, the first day of trial in this civil litigation, the trial court laid out the ground rules for admission of documentary evidence, including the Rule 6(e) grand jury materials:

> Concerning the documents that the Court has determined were obtained by the government in violation of Rule 6–E— that is, the Federal Rule of Criminal Procedure, Rule 6–E in reference to the grand jury secrecy. These documents will be received in evidence assuming they comply with one of the above stated ground rules, and in the Court's final order and judgment herein, a determination will be made whether or not the documents will be considered. Any

government calculations in this matter should be in the alternative. That is, with any of such Rule 6–E documents being included, and also them being excluded. (Vol. I Record, pp. 44, 45).

In entering Findings of Fact and Conclusions of Law, the trial court ultimately made a decision on the status of the materials obtained by the government in violation of Rule 6(e)—and that was to exclude all such documents as evidence when calculating the extent of defendants' unjust enrichment through their miscertification scheme. Thus in Findings of Facts Nos. 41, and 42, the court found that:

> 41. As a result of the defendants' crude oil purchase and sale policies and practices of miscertification, profits were realized by the defendants of $210,736,-532.92.... This sum of $210,736,532.92 allows the defendants credit for sales of uncontrolled (stripper and foreign) crude oil as well as some other crude oil which defendants sold for substantially less per barrel price than it paid, which was brought about principally by the tier price averaging scheme discussed in paragraph 23 above....

> 42. The plaintiff's claim seeks restitution for unjust enrichment. The defendants should be required to disgorge the amount of profit they have been unjustly enriched due to the crude oil sale certification violations. This sum is the amount of the profits realized by defendants from implementation of their crude oil miscertification scheme which is the sum of $210,736,732.92.... (R. 26,126, 26,127).

By footnote to these two findings, the court noted that:

> The Court by its Order dated January 7, 1983 determined that some of the doc-

---

niently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court."

**5.** The trial court found that the government and Mr. Swartz, the Assistant U.S. Attorney, "were

relying on existing case authority" as well as on an order of Judge James O. Ellison entered October 8, 1981 in a criminal case, which held that the literal language of Rule 6(e) did not apply to physical evidence, such as documents and records, if they had been created for purposes not related to the grand jury investigation itself. As noted by the trial court, the ruling in *Sells* was to the contrary. R. 24,258.

uments were obtained by the Government in violation of F.R.Crim.P. 6(e). *This restitution amount of $210,736,-532.92 excludes said documents from the calculation as an appropriate sanction."* (R. 26,127) (Emphasis supplied.)

In Conclusion of Law No. 12, R. 26,144, the court ruled that:

During the entire period beginning in May 1976 and continuing through January 1981, defendants falsely certified or failed to certify 177,605,924.48 barrels of crude oil in violation of 10 C.F.R. Secs. 212.131, 210.62(c) and 205.202. However, for purposes of restitution the miscertified barrels total 167,340,263.01 and a restitution amount of $210,736,-532.92....

Again by footnote, the court explained that "as an appropriate sanction" the figure of $210,736,532.92 excluded the Rule 6(e) material from calculation.

■ We find that admission of 98% of the documents in question was correct and without error since the grand jury secrecy rule does not apply to documents which are already a part of the public record. The public has the right of access to all criminal trials, as well as the right to inspect and copy all records of judicial proceedings not under seal. All of the questioned documents admitted by the trial court were introduced in evidence as Exhibits 27 and 53 in the criminal trial or were physically present in court to support the summary Exhibits 80 and 81 admitted under Rule 1006, Fed.R. Evidence. These "back-up" materials were in fact the real evidence presented in the case. The summaries only avoided the unnecessary introduction of multi-volumes of paper material. These supporting documents did not need to be separately admitted in evidence, as long as they were made available to other litigants and the court. *Midcontinent Broadcasting Co. v. North Central Air., Inc.,* 471 F.2d 357, 359–360 (8 Cir.1973). Here, it is admitted that the documents supporting the summary exhibits had been turned over to defendants during discovery in the criminal case, the documents were present in the courtroom throughout the criminal trial, and they were in fact the subject of extensive cross-examination during that criminal trial, following the admission of the summary exhibits 80, and 81. (Criminal Trial Transcript pp. 3034–3047, Vol. 47, Record, pp. 22,592–22,605). Under these circumstances, we are satisfied that the documents supporting the summary exhibits were no longer subject to the grand-jury secrecy requirements of Rule 6(e).

■ The government contends that the trial court erred in excluding the remaining 2% of the documents in question because these third party business records, all physical items of evidence, were not within the scope of "matters occurring before the grand jury," subject to Rule 6(e) protection. The argument is made that physical items of evidence, such as these business records, do not reveal what occurred before a grand jury, because they were created *before* the grand jury at issue even came into existence. In this respect, the government relies upon the reasoning expressed by the Third Circuit in *In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3 Cir.1980):

The mere fact that a particular document is reviewed by a grand jury does not convert it into a 'matter occurring before the grand jury' within the meaning of 6(e). Documents such as the business records sought by the Commission here are created for purposes independent of grand jury investigations, and such records have many legitimate uses unrelated to the substance of the grand jury proceedings.

■ A number of other circuit courts have determined that documents are subject to the provisions of Rule 6(e). See *e.g., Fund for Constitutional Gov. v. National Archives,* 656 F.2d 856, 868–870 (D.C.Cir. 1981). Whatever may have been the state of law prior to the decision of the Supreme Court in *United States v. Sells Engineering, Inc., supra,* the Court in *Sells,* speaking in terms of "grand jury materials," determined that documents which had been produced before a grand jury could not be disclosed to attorneys and others within the

Justice Department's Civil Division, without a prior court order obtained after a showing of particularized need.

The government suggests that the ruling in *Sells* should not be applied retroactively. The Ninth Circuit has held, however, that the companion case to *Sells, United States v. Baggot,* 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983), should apply to a disclosure order filed three years before *Baggott* was decided.[6] *In Re Sells,* 719 F.2d 985 (9 Cir.1983). As pointed out by the Ninth Circuit,

> The general rule is that an appellate court should apply the law as it stands on the date of the appellate decision. See *Thorpe v. Housing Authority,* 393 U.S. 268, 281–83, 89 S.Ct. 518, 525–27, 21 L.Ed.2d 474 (1969); *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). This is true even if the result is reversal of a decision that was correct when made. Courts have made exceptions to this general rule to prevent manifest injustice, ... but this is not such a case.... (719 F.2d at 990).

In determining that the government had violated the provisions of Rule 6(e) as to 2% of the questioned documents, the trial court correctly interpreted and applied *existing* law, as found in the ruling of the Supreme Court in *Sells.* As to these documents, defendants have obtained the relief which they sought for in its ultimate findings of fact and law, the trial court excluded all of these documents in its determination of liability. The trial court did not abuse its discretion in electing to impose this exclusion as an appropriate sanction.

## IV. *Validity of the Regulations*

Defendants contend that the trial court erred in denying their supplementary motion for summary judgment since the regulations upon which the government relied were invalid and of no effect because they had been adopted or amended without proper notice or opportunity for oral comment.

The history and application of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. Sec. 1904 note, and the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. Secs. 751 et seq. have been many times reviewed by the Court and that history will not be again reviewed in detail. The Cost of Living Council originally set up a two-tier pricing system for price controlled, "old", oil, and free market priced, "new", oil 6 C.F.R. Sec. 150.354. On February 1, 1976, the regulations were amended to create a three-tier crude oil pricing system that was in effect for the pricing periods here in question. 10 C.F.R. Secs. 212.72–212.76. Under these provisions, there were two levels of price controlled oil (lower tier, or old oil, and upper tier or new oil), as well as free market priced oil. Production up to a level set during a base period was sold as old oil, the excess could be sold at a higher controlled price as "new" oil, while the third tier consisted of foreign crude oil and, after September 1, 1976, stripper oil, both of which could be sold at free market prices.

In order to equalize the benefits of price controlled oil, the Federal Energy Office set up the "Old Oil Allocation Program" in 1974. This program, referred to as the "Entitlements Program", reallocated cost benefits received by those refiners who had access to large quantities of price controlled oil to those refiners who were obliged to rely on sources providing high cost, uncontrolled oil. Under this program each refiner was issued monthly "entitlements" to its proportionate share of the national supply of price controlled oil. If its entitlements were fewer than the number of barrels of lower tier oil actually refined for the month, the refiner was required to purchase additional entitlements from refiners who did not have access to lower priced oil. The price of each entitle-

---

**6.** In *Baggot,* the Supreme Court held that disclosure of grand jury materials for use in an IRS audit of civil tax liability is not available because an investigation to determine tax liability is not preliminary to, or in connection with, a judicial proceedings within the meaning of Rule 6(e).

ment was set by the Department of Energy each month and was generally equal to the difference in price between the average cost of lower tier oil and the average cost of oil not subject to price controls.

From the beginning, *producers* of crude oil were required to certify in writing to their purchasers the tier of each volume of crude oil sold. 6 CFR Sec. 150.354(c)(4) (1973). When the entitlements program was established the certification regulations were extended to all crude oil *resellers* in order to identify and trace particular transactions in crude oil to the refinery. 10 C.F.R. Sec. 212.131. A reseller was defined as a firm which carried on the trade or business of purchasing crude oil and reselling it, "without substantially changing (its) form, to purchasers other than ultimate consumers." 10 C.F.R. Sec. 212.131.

From November, 1974 until September, 1976, a reseller was required to certify in writing all lower tier oil and the lawfulness of the prices charged. 10 C.F.R. Sec. 212.-131(a)(2) (December 4, 1974). After the three-tier system was adopted, a reseller was required to certify each different tier in each resale. Thus, 10 C.F.R. Sec. 212.-131(b)(1) provided that:

> (E)ach seller of domestic crude oil ... shall, with respect to each sale of domestic crude oil ... certify in writing to the purchaser the respective volumes of and ... per barrel prices for the old crude oil, new crude oil, stripper well crude oil, and other domestic crude oils.... The certification shall also contain a statement that the price charged for domestic crude oil is no greater than the maximum price permitted ... by law.

Section 212.131(c) of 10 C.F.R. made it unlawful for a reseller to sell crude oil unless it provided the required certifications. These certifications were to be in writing either upon the invoice or by separate instrument. Sec. 212.131(d).

Crude oil resellers were prohibited from engaging in any practice that circumvented or contravened or resulted in the circumvention of the agency's regulations. 10 C.F.R. Sec. 205.202, formerly Sec. 205.201. A reseller was also prohibited from employing any practice that constituted a means to obtain a price higher than that permitted by the regulations. 10 C.F.R. Sec. 210.-62(c). All firms were required to maintain appropriate records and to provide access to such records when requested by the agency. 10 C.F.R. Sec. 210.92(a) and (b). Beginning in January, 1978, crude oil resellers were required to file monthly reports on Form ERA-69 for the purpose of determining compliance. 10 C.F.R. 212.-187(b). Following decontrol, the record keeping requirements were continued in effect for all transactions prior to the date of decontrol, April 1, 1981. 10 C.F.R. Sec. 210.1 (April 3, 1981).

Under this regulatory scheme, if price controlled crude oil was miscertified as uncontrolled oil, then "old oil" receipts by refiners would be artificially reduced, thus decreasing the ratio of "old oil" to all refined oil and distorting the entitlements program. This would result in fewer "old oil" entitlements being issued, thus increasing the cost of crude oil for all refiners because less low priced oil would be available to lower the average. These higher costs would then be passed on by the refiners to others in the distribution chain, and finally on to the ultimate consumers.[7]

◼ In this appeal, defendants contend that there was never a valid DOE regulation which required any form of certification by crude oil resellers because the DOE did not comply with the rule-making requirements of the Administrative Procedure Act (APA), 5 U.S.C. Secs. 551–559, the Federal Energy Administration Act

---

7. In *Union Oil Co. of Cal. v. U.S. Dept. of Energy,* 688 F.2d 797, 802 (TECA 1982), *cert. den.,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983) we discussed the effect upon the Entitlements Program of miscertifications of crude oil production. *See also* our discussion in *United States v. Exxon Corp.,* 773 F.2d 1240, at p. 1284–1286 (TECA 1985), *cert. den.,* —— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), *rehearing denied,* —— U.S. ——, 106 S.Ct. 1526, 89 L.Ed.2d 923 (1986).

(FEAA), 15 U.S.C. Sec. 766, and/or the Department of Energy Administration Act (DOEOA), 42 U.S.C. Sec. 7191. These arguments were presented to, fully considered, and then overruled by, the district court in a lengthy Order filed on April 4, 1984. Vol. I, Defendants' Record, Item 9. In order to avoid undue expansion of this opinion, we adopt the findings of the District Court in reaching our conclusion that the trial court properly found that the regulations are procedurally and substantively valid. Specifically, we conclude that the trial court properly found:

■ 1. That the first amendment to Sec. 212.131 which required all resellers to certify appropriate classifications contained a request for comment, comment was in fact received, and there was substantial compliance with the notice required of the APA, 5 U.S.C. Sec. 553. *People of the State of California State Lands Comm'n v. Simon*, 504 F.2d 430, 439 (TECA 1974), *cert. den.*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974).

■ 2. Section 212.131 was in fact repromulgated on December 4, 1974 in a procedurally valid manner, and it was therefore unnecessary for the court to pass on the validity of the August 29, 1974 amendment. *Atlantic Richfield Co. v. U.S. Dept. of Energy*, 655 F.2d 1118, 1127 (TECA 1981).

■ 3. When the FEA amended the reseller certification requirements of Sec. 212.131(b)(1) effective September 1, 1976, to require separate identification of old, new, and stripper oil, it determined that the certification provisions would be modified without an opportunity for prior written comment or oral testimony.[8]

The action of the FEA complied with the provisions of 15 U.S.C. Sec. 766(i)(1)(B) which allowed the FEA to proceed without notice and opportunity to comment "where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order." The September 1976 amendment to Sec. 212.131 was procedurally valid.

■ 4. New Subpart L regulations effective January 2, 1978 set out new pricing standards. On December 23, 1977, Sec. 212.131 was amended to state that certifications must contain a statement that prices charged were determined in accordance with the requirements of Subpart L. This amendment was not mentioned in the notice of proposed rule-making issued in August, 1977 in connection with new Subpart L rules, and thus the requirements of the APA and the FEAA were not complied with. Since all sellers were required to follow Subpart L anyway, beginning January 1, 1978, the December, 1977 amendment was only a technical amendment to the certification requirements, there was no substantive change in the duties of the resellers, and thus the failure of the agency to give notice and opportunity for comment as to this amendment did not invalidate the regulation. *Nat. Helium Corp. v. Federal Energy Administration*, 569 F.2d 1137, 1146 (TECA 1978).

■ 5. The provisions of 10 C.F.R. Sec. 210.62(c), which prohibit any firm from employing any practice designed to obtain unlawful prices was formerly codified as 6 C.F.R. Sec. 150.20, as adopted by the Cost of Living Council. When the Federal Energy Office was created, it repromulgated the old CLC regulations with notice and opportunity for comment. Inadvertently, the recodification did not include Sec. 150.-20, but correction was made in February, 1974, with the explanation that Sec. 150.20

8. The FEA explained that:
 "The amendments are effective September 1, 1976, because any delay in their effectiveness as compared with the statutory effective date of the exemption of stripper well crude oil could result in inconsistencies between the pricing of stripper well crude oil (and other exempt crude oils) and their treatment under the entitlements program. Such a delay could also be detrimental to some refiners, in that the cost equalizing calculations of the entitlements program would not take into account for those refiners the higher exempt prices for these crude oils." (41 Fed.Reg. 37309).

had been omitted and that the reinclusion of Sec. 150.20, as Sec. 210.62(c), was a technical correction. Under 5 U.S.C. Sec. 553(b)(3)(B), the FEO found there was good cause to promulgate the regulations immediately without inviting comment. The fact that there was no notice and opportunity for comment does not invalidate Sec. 210.-62(c). We recently addressed the merits of violations of Sec. 210.62(c) in *Eastern Air Lines v. Mobil Oil Corp.*, 677 F.2d 879, 881 (TECA 1982), and *USA Petroleum Corp. v. Anaconda Co.*, 653 F.2d 502, 510–511 (TECA 1981).

6. Section 205.202 of 10 C.F.R. provides that:

Any practice that circumvents or contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter or any order issued pursuant thereto is a violation of the DOE regulations stated in this chapter.

This section, previously numbered Sec. 200.8, and Sec. 210.81, was previously included in proposed rulemakings in December, 1973, and in July, 1974 at which time notice and opportunity to be heard were properly given. Accordingly, Sec. 205.202 is procedurally valid.

7. Defendants contend that Sec. 212.131 is substantially invalid because it is unconstitutionally vague, and because the DOE did not consider the relevant factors as required by the EPAA before promulgating that section, and no rational basis for it exists.

Section 212.131 provides in pertinent part that:

(b)(1) *Reseller certification.* Each seller of domestic crude oil ... shall, with respect to each sale of domestic crude oil ... certify in writing to the purchaser (i) that the price charged for the domestic crude oil is not greater than the maximum price permitted pursuant to this part and (ii) the respective volumes of and respective per barrel prices for the—

(A) Lower-tier ('old') crude oil ...

(B) Upper-tier ('new') crude oil ...

(C) Crude oil transported through the trans-Alaska pipeline ...

(D) Stripper well crude oil;

(E) Incremental tertiary crude oil;

(F) Tertiary incentive crude oil;

(G) Newly discovered crude oil;

(H) Market Level new crude oil;

(I) Heavy crude oil; and

(J) Other domestic crude oils the first sale of which is exempt from the provisions of this part—included in the volume of domestic crude oil so sold.

As noted by the trial court, it is clear that this regulation requires a reseller of crude oil to maintain certifications for particular volumes of crude oil transactions. This language adequately describes the conduct required of sellers of crude oil. While a regulation could have been drafted more precisely, the doctrine prohibiting vagueness even in criminal law, requires "no more than a reasonable degree of certainty." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367, 371 (1952). In *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371–372 (1982), the Supreme Court pointed out that the degree of vagueness that the Constitution will tolerate depends in part upon "the nature of the enactment":

Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

8. Defendants also claim that Sec. 212.131 is substantively invalid because the DOE failed to consider the objectives set forth in 15 U.S.C. Sec. 753(b)(1) which provides that regulations issued under the EPAA shall, to the extent practicable, pro-

vide for the public health, safety and welfare; maintain all public services, and agricultural operations; preserve an economically sound and competitive petroleum industry; allocate crude oil so as to permit refineries to operate at full capacity; provide for equitable distribution of crude oil and products at equitable prices; maintain the exploration for, and production of, fuels and other minerals; promote economic efficiency; and minimize economic distortion and unnecessary interference with market mechanisms.

In setting up the Entitlements Program, the FEA fully considered all of those objectives. In *Cities Service Co. v. FEA,* 529 F.2d 1016, 1025, (TECA 1975), *cert. den.,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), we determined that the entitlement regulation was "a rational response to the changing conditions under which the objectives of the (EPAA) section 4(b) must be read," and that the regulation was not arbitrary, capricious or an abuse of discretion. The certification regulations were implemented to assure that the Entitlements Program would operate in such a manner that each refiner could determine the composition of the crude oil which passed through its refinery. Under such circumstance, it is clear that the DOE gave full consideration to the objectives described above, and that such regulations are substantively valid.

### V. *Evidentiary Rulings*

In proving its case, the government prepared an analysis of defendants' crude oil transactions over the years, and this analysis, referred to as "the audit", was received in evidence as Plaintiff's Exhibit 1. As described by defendants, this audit included (a) 50 volumes entitled "BPM, Ltd., Analysis of Matched Purchases and Sales"; (b) 50 volumes entitled "BPM, Ltd., Source Documents", which included purchase invoices, sales invoices, purchase contracts, and sales contracts; (c) 50 volumes entitled

"BPM, Ltd., Analysis of Transactions by Pipeline Locations and Supporting Documentation"; (d) 2 volumes entitled "BPM, Ltd., Summary Schedules and Source Documents Relating to Matched and Unmatched Barge Transactions"; and (e) 1 volume entitled "BMP, Ltd., Documentation to Support Transactions with Trucked Crude Oil".

The "source documents" mentioned above were generally documents obtained from third parties who transacted business with defendants, and they were offered in evidence, supported by third party interrogatories sent by the government to some 64 separate companies. Defendants objected to all such evidence as hearsay, claiming that the "personal knowledge" requirements of Rules 602 and 806(b) of the Federal Rules of Evidence had not been satisfied.[9]

Rule 803(6), Fed.R.Evid., the Business Records Rule, provides an exception to the general rule prohibiting hearsay evidence, in the case of:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Rule 803(24), sometimes referred to as the "residual hearsay exception", further provides for the admission of:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered

---

**9.** Rule 602 provides that a witness may not testify to a matter without personal knowledge

of that matter.

as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement in evidence....

Prior to trial, the parties spent several days before the Magistrate in an unsuccessful attempt to reach understanding on the admissibility of documentary evidence. After receiving the Magistrate's report, the trial court then conducted a five day hearing upon defendants' hearsay objections to almost all of the government documentary evidence. (Vols. I through V, Record, pp. 1 through 1117). Before doing so, the court set out the ground rules which would govern all rulings on this type of evidence:

Let me make some basic comments here before we get underway in this matter, with specific further de novo document exhibit discussion. Of course, the underlying consideration in reference to this myriad of documents is: Do they, or does the document have the necessary indicia of reliability and trustworthiness. After reviewing this matter with the magistrate, the following are general views of mine. And I say reviewing this matter with the magistrate, I also have reviewed what briefs were filed on the subject of these exhibits up through noon of last Friday.

First, if the documents were produced by the defendants or entities owned by the defendants pursuant to a subpoena or voluntarily and they appear to have relevance to the issue of alleged miscertification here, they probably will be received in evidence. Authority for this conclusion is Rule 901–A, 901–B(4), 803(6), 803(24) and a couple of applicable cases on the subject are *Fisher versus U.S.*, 425 U.S. 391 at 413 [96 S.Ct. 1569 at 1582, 48 L.Ed.2d 39], *U.S. v. Fox,* 721 Federal 2nd 32, pages 38 to 40.

Secondly, documents authenticated by a third party records custodian wherein the defendants have been given the right

of cross-examination concerning these documents, and if appearing relevant to the issues of crude oil tier certification, will be received in evidence. The same cited Federal Rules of Evidence sections the Court thinks are applicable here. Cases on that subject the Court thinks are relevant are *Rosenberg v. Collins,* 624, Federal 2nd, 659 to 665, *U.S. v. Evans,* 572 Federal 2d, 455, at 490 and *U.S. v. Veytia-Bravo,* 603 Federal 2nd, 1187, 1191 to 1192.

Next, documents produced by a third party, ... by subpoena or otherwise—regarding which the defendants have had no right to cross-examination, will probably not be received in evidence unless during the trial, an appropriate witness should provide the necessary predicate for the document to be admitted and thereby affording the defendants the right of cross-examination.

The next category is the box. That is, Plaintiff's Exhibit 53 in the criminal trial of *U.S. v. Sutton,* case 81–CR–97, in this court, which is documents 1 through 4106 in this case, will be received in evidence based upon the ruling of the 10th Circuit.... In reference to those documents, the better approach would be to have the criminal trial witness, if available to supply the underlying testimony for admission of the 'box'. However, if the witness is not available or is outside the 100 mile subpoena distance, the relevant parts of the criminal trial transcript should be offered as a part of the record in this case.

\* \* \* \* \* \*

Concerning the issue of trustworthiness, a consideration in this case is that 10 C.F.R. Section 210.92 requires the crude oil reseller to maintain appropriate records for review on a proper request.... The vast majority of the records required to be maintained by the defendants, it appears at least at this juncture in this case, have not been produced by the defendants. Added to this, is the fact that the individual defendant

in this case, Mr. Robert Sutton, was convicted of conspiracy to obstruct justice in attempting to destroy records. The ideal situation is that of the reseller who has maintained all of its books and records.... We don't have that here.

Therefore, the Court will look to the assurances of trustworthiness in the context of what I discussed above. The Court thinks this is within the spirit and the intend(sic) of Federal Rules of Evidence expressed in Rule 901–B(4) and 803(24). (R. pp. 41–44).

The cases relied upon by the trial court establish that any person with authority to do so may attest to the authenticity of business records, even though he was not the preparer of the record, and even though he can not personally attest to the accuracy of the information contained in the business record. *Rosenberg v. Collins*, 624 F.2d 659, 665 (5 Cir.1980). The custodian need not even have been employed by the business when the records were created or received. *United States v. Evans*, 572 F.2d 455, 490 (5 Cir.1978). In *United States v. Veytia-Bravo*, 603 F.2d 1187 (5 Cir.1979), *cert. den.*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980), a case involving business records kept in compliance with federal regulations, the court stated:

> Where circumstances indicate that the records are trustworthy, the party seeking to introduce them does not have to present the testimony of the party who kept the record or supervised its preparation. Testimony by the custodian of the record or other qualified witness that the record is authentic and was made and kept in the regular course of business will suffice to support its admission. (603 F.2d at 1191–92)

As noted, in addition to the business records exception to the hearsay rule, the trial court also relied upon the provisions of Rule 803(24), which permit, as justice may require, the admission of probative hearsay evidence, when more direct evidence can not be procured through reasonable effort. In this case, it is clear that defendants failed to maintain the records required by law. When a party fails to keep, or refuses to produce documents, or in fact destroys evidence, an adverse inference may certainly be drawn, and where vital documents are missing, Rule 803(24) is the obvious vehicle to be employed in serving justice. See *Karme v. C.I.R.*, 673 F.2d 1062, 1065 (9 Cir.1982).

Defendants also claim that the testimony of James L. Louthan, the government's principal audit witness, should have been excluded as opinion testimony by a lay witness, and as inadmissible hearsay. Louthan supervised the audit and summarized the work of approximately 20 auditors who worked on the project. His testimony was properly admitted under Rule 602, Fed.R. Evidence, as testimony based upon personal knowledge. Rule 701 Fed.R.Evid. allows a lay witness to give opinions or to draw inferences "which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." In addition, the record demonstrates that defendants had ample opportunity to depose this witness concerning the audit for several days prior to trial. Mr. Louthan's testimony was properly admitted.[10]

Defendants next contend that all evidence concerning what they term "reseller chains" should have been excluded because the government failed to provide

---

10. In its Findings of Fact and Conclusions of Law, the trial court described the nature of Louthan's testimony in this manner:

> James Louthan was the DOE auditor in charge of the audit. As the supervising auditor he had a hybrid expert-nonexpert status. In interpreting and explaining the audit methodology employed, as well as his 'understanding' of the applicable DOE regulations,

Louthan could be considered an expert. Concerning the DOE policy and rationale behind the policy and/or regulations, Louthan could not be considered an expert as he was not involved in the formulation of the policy or regulations nor did he have such authority. In the areas Louthan could be considered an expert, the defendants were granted extensive discovery. (Findings, page 10, f.n. 1)

pretrial discovery in this area, and because the "reseller chain" documents and testimony were irrelevant in this action. Prior to trial, the trial court directed the government to provide some reseller chain evidence in order to establish the effect of Sutton's miscertifications on the entitlements program. While such evidence of transfer chains would not be relevant to the question of whether Sutton miscertified crude oil, it was offered, at the direction of the trial court, as relevant rebuttal evidence to defendants claim of lack of harm to the entitlements program, the industry and the consumer. The defendants deposed Louthan on the chain documents prior to trial, and another opportunity to depose this witness in the middle of the trial was waived. There was no error in the admission of evidence concerning reseller chains in which defendants were involved.

Evidentiary rulings by our trial judges will not be overturned on appeal absent a clear abuse of discretion. Here, the district court's evidentiary rulings are fully supported by the record and the law.

## VI. *Liability*

At trial, the government established the audit of defendants' certifications for the period of May, 1976 through January, 1981 upon the basis of third party business records, and records which defendants produced for the grand jury. Crude oil transactions were reconstructed by matching corresponding purchases and sales of crude oil by type and quality, pipeline delivery points and volumes. James Louthan, who directed the audit, testified for eight days, explaining the audit methods and its results. Defendants failed to file DOE Form ERA–69, the "Crude Oil Reseller's Self-Reporting Form" for each month which included sales during the period of January, 1978 through January, 1981. The trial court found that the audit methodology was reasonable and appropriate:

Most of defendants' purchases and sales had to be reconstructed from third party records, because defendants have no adequate records of their crude oil reselling activity beyond those reflecting transactions occurring during the period of May 1980 through January 1981.... The certification audit methodology of matching crude oil purchases and sales of the defendants, although often involving auditor judgment, was reasonable and appropriate in view of the defendants' failure to maintain and keep accurate records. The audit matching process was essentially supported by the reconstructed records. Although the defendants took issue with the audit methodology, they offered no alternative certification audit to rebut the government's audit. (Finding of Fact No. 27)

This audit established that defendants generally purchased more lower tier and upper tier crude oil by paying prices *above* the prevailing market price, and then, upon resale, defendants miscertified the crude oil as either upper tier, stripper, or foreign crude oil, and generally resold the miscertified crude oil at prices *below* the prevailing market price for the new tier to which it had been miscertified:

The defendants would usually purchase from a reseller lower tier, upper tier and stripper crude oil and the defendants would then average the purchase price and resell all of the oil certified (miscertified) as stripper, adding a profit of approximately one dollar ($1.00) to one dollar and a half ($1.50) per barrel. The profit realized may have been within the pricing guidelines, but the bulk of the oil resold was miscertified by tier.

By July 1977 and continuing thereafter, Sutton began to buy from, miscertify and sell directly back, usually on the same day, to the same resellers on a regular and continuous basis.... This could aptly be described as tier laundering, i.e., from controlled with its lower market price to uncontrolled with its higher market price and economic potential.... (Findings of Fact Nos. 23, 24)

The evidence of miscertification was overwhelming. From May 1976 through January 1981, defendants purchased 133 million barrels of lower tier oil, 175 million

barrels of upper tier oil, and 33 million barrels of stripper oil. (F/F 33) During that same period, defendants sold only 8 million barrels of lower tier oil, 31 million barrels of upper tier oil, and over 283 million barrels of stripper oil. These figures establish that defendants bought 269 million more barrels of price-controlled oil than they sold, and sold 250 million more barrels of uncontrolled stripper oil than they bought. On the basis of this evidence, the trial court found that for the relevant period, defendants falsely certified, or failed to certify, 177,605,924.48 barrels of crude oil in violation of 10 C.F.R. Secs. 212.131, 210.62(c), and 205.202. For purposes of restitution, the miscertified barrels were set at 167,340,263.01, with a restitution amount of $210,736,532.92.[11] (Conclusion of Law 12) In addition to the documentary evidence provided by the audit, the testimony of various employees of defendants established the true nature of defendants' crude oil reselling transactions.[12]

■ The trial court's finding that defendants falsely certified or failed to certify crude oil as stated is supported by substantial evidence and is not clearly erroneous.

Defendant Robert Sutton contends that the trial court erred in holding him personally liable for the full amount of defendants' miscertifications.

■ He first alleges that Section 5(a)(4) of the EPAA, 15 U.S.C. Sec. 754(a)(4) provides the exclusive remedy for knowing and willful violations of the Act by corporate officers, thereby precluding imposition of liability upon the basis of alter ego, or tortious conduct. That section provides that:

Any individual director, officer, or agent of a corporation who knowingly and willfully authorizes, orders or performs any of the acts or practices constituting in whole or in part a violation of paragraph

(3), shall be subject to *penalties* under this subsection without regard to any penalties to which that corporation may be subject under paragraph (3) except that no such individual director, officer or agent shall be subject to imprisonment under paragraph (3), unless he also has knowledge, or reasonably should have known, of notice of noncompliance received by the corporation from the President. (Emphasis supplied)

Section 5(a)(3) of the Act, 15 U.S.C. Sec. 754(a)(3), referred to above, provides for imposition of *civil penalties*, as well as criminal penalties for violation of the Act. Section 5(a)(4) neither precludes an action for *restitution* under the provisions of Section 209 of the ESA, nor does it abrogate notions of common law alter ego liability, or liability in restitution for one's own tortious conduct. The legislative history of Section 5(a)(4) explicitly provides that "nothing in the section is intended to change existing case law relating to the individual responsibility of corporate directors, officers or agents for violation of those corporations." *See* S.Conf.Rep. No. 94–516, 94th Cong., 1st Sess., *reprinted in* 1975 U.S.Code Cong. & Ad.News, 1956, at 2042. *See also, Johnson Oil Co., Inc. vs. U.S. Dept. of Energy,* 690 F.2d 191, 202 (TECA 1982). The fact that a statute does not explicitly provide for piercing the corporate veil does not preclude application of that doctrine. *United States v. Pisani,* 646 F.2d 83, 87–89 (3d Cir.1981).

Again, the evidence concerning Robert Sutton's control over his various corporate entities is overwhelming, and without dispute. There was evidence of noncompliance with corporate formalities, nonpayment of dividends, failure of directors to play any meaningful role in managing the corporation, absence of any arm's length relationship between Sutton and his corporations, diversion of corporate funds for

---

**11.** This reduction resulted from excluding 2% of the grand jury documents offered in evidence.

**12.** E.g., Robert B. Sutton told his employees, "We don't buy stripper, we sell stripper." (F/F 19). Robert B. Sutton made an agreement with

the president of AWECO to fabricate tier certifications on 12 sales invoices in exchange for a $1,000,000 payment to a Sutton owned company. (F/F 25).

personal purposes, payment of personal expenses with corporate funds, use of corporate assets for personal purposes, payment of excessive compensation to Sutton and members of his family, the making of non-interest bearing loans to Sutton and his allied companies, and inadequate capitalization of, and intermingling of funds among, Sutton's various corporations, all at his direction.[13]

The trial court found that virtually all of the profits generated by the corporate defendants were obtained through Sutton's illegal crude oil trading operations. Financial statements indicated that the total assets and net worth of defendants Sutton Investments and its subsidiaries, including BPM and Redfish Bay, successor to defendant Scurry Oil Company, were approximately $46.2 million and $14.4 million, respectively. At the time of trial, BPM and Sooner Refining Company had filed for bankruptcy, and in April, 1984, soon after the trial court appointed a receiver because of failure to comply with the court's financial reporting order, Robert B. Sutton and Sutton Investments filed for bankruptcy. In its findings of fact, the trial court found that:

> The corporate defendants' creditors, including the United States, have been materially harmed by Sutton's appropriation of corporate funds to himself, his family, and his numerous personally-owned business ventures. As a result, the funds available to the corporate defendants with which to pay the judgment in this case are significantly inadequate. (F/F 102).

As of October 31, 1983, Sutton's stated total personal assets were $39.9 million. His stated personal net worth was $23.8 million. This stated total personal net worth in late 1983 was $23.6 million dollars more than his net worth in 1976 when Sutton initiated his miscertification scheme.[14]

▆▆▆ Without reference to state law, this Court has held that the corporate veil may be pierced to hold a controlling shareholder liable for corporation violations of DOE regulations. *United States v. Ariz. Fuels Corp.*, 638 F.2d 239, 244 (TECA 1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981). The Tenth Circuit, applying the Oklahoma law, has recognized the general rule, concluding that "Oklahoma permits the court to disregard the corporate entity if used, (1) to defeat public convenience, (2) justify wrong, (3) to perpetrate fraud whether actual or implied, or (4) to defend crime." *Robertson v. Roy L. Morgan Production Company*, 411 F.2d 1041, 1043 (10th Circuit 1969).[15]

▆▆▆ In addition to piercing the corporate veil, the district court found that Sutton was liable on account of his own tortious conduct. The finding that Sutton was the central figure in the miscertification scheme is supported by substantial evidence. Liability for tortious conduct depends upon the individual's acts, and not upon any theory of vicarious liability based upon mere status as an owner or other party responsible for corporate activities. A shareholder may be liable if he is the "central figure" in a corporation's tortious conduct. *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871, 881 (S.D. Ala.1980), *aff'd as modified, Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (TECA 1982), *cert. denied*, 459

---

**13.** By April, 1980, twelve affiliates owed BPM over $44 million, with $33 million due from 6 firms owned directly by Sutton. (F/F 80).

**14.** The government estimated that Sutton withdrew at least $67 million for his personal use during the audit period—$11,511,323 directly, at least $56,247,602 indirectly through his personal business ventures, and approximately $1,261,-000 paid to family members.

**15.** Sutton contends that the district court should have applied Oklahoma law on the piercing issue, but *United States v. Arizona Fuels Corp., supra,* is fully in accord with the general rule that in federal question cases, where the governing statute is silent, federal common law, not state law controls. Sutton's case citations do not persuade us that Oklahoma law is in any way contrary to the standards applied by the trial court.

U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).

■ The evidence fully supports the district court's conclusion that Robert Sutton is jointly and severally liable with his corporate defendants because these corporations were Sutton's alter egos and because Sutton personally engaged in tortious conduct. Such findings and conclusions are not clearly erroneous.

## VII. *The Nature of Restitution, and the Amount of Recovery*

Under the provisions of Sec. 209 of the ESA, 12 U.S.C. Sec. 1904, *Note,* the district court was authorized to order restitution of benefits received in violation of orders and regulations issued under the Act.[16]

The defendants contend that the remedy awarded in this action was a penalty, and not restitution, because the government failed to demonstrate unjust enrichment or injury. The argument is made that because the trial court ordered that the monies be disbursed to state governments (allegedly "non-injured parties"), the Court's award constituted a penalty, and not restitution. Upon this basis, the defendants further claim that since the government's claim is a penalty claim, the trial court erred in rejecting the statute of limitations defense, that the penalty claim is barred as a matter of law by the doctrines of collateral estoppel and double jeopardy, and that the trial court erred in denying defendants a jury trial.

■ This court recently had the occasion to examine at length the nature of the restitution claim under the provisions of Sec. 209 of the ESA. *United States v. Exxon Corp.,* 773 F.2d 1240 (TECA 1985), *cert. den.,* — U.S. —, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), *rehearing denied,* — U.S. —, 106 S.Ct. 1526, 89 L.Ed.2d 923 (1986). Defendants' assertion that restitution is appropriate only if both unjust enrichment and injury to third parties is estab-

lished is without merit. In *Citronelle-Mobile Gathering, Inc. v. Edwards, supra,* 669 F.2d 717 at 722, we pointed out that:

> The central purpose of restitution is to determine the amount by which the wrongdoer has been unjustly enriched and then to make him disgorge that amount. *No proof is required that the plaintiff was damaged, much less the amount of any damage.* (Emphasis supplied)

■ An award of restitution is an equitable remedy, and not a penalty. Under such circumstances, the district court properly denied Sutton's request for a jury trial. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 95 (2d Cir.1978).

■ A civil prosecution under the provisions of Section 209 is not barred by double jeopardy because of a prior unsuccessful criminal action. *See, One Lot Stones,* 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438, 442 (1972). Defendant's attempt to avoid this rule by claiming that the restitution awarded by the district court was really a criminal penalty is without merit.

■ State statutes of limitation are not applicable to cases brought to enforce DOE regulations. *Citronelle-Mobile Gathering, Inc. v. Edwards, supra,* 669 F.2d at 721:

> The primary underlying policy of the ESA is to insure effective enforcement of the pricing regulations on a national scale.... As an aide (sic) to such enforcement the DOE has the right to seek restitution in ESA enforcement actions.... The right to enforce compliance to such restitution of price overcharges is equitable ... and suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even if brought by a private party.

---

**16.** Section 209 provides that the Attorney General may bring an action for temporary and permanent injunction to restrain violations, and the court is authorized to issue such injunctions, as well as to "order restitution of moneys received in violation of any such order or regulation."

 The award of equitable relief in this action is not barred through the doctrine of unclean hands on the part of the government. In June, 1984, defendants filed a motion to reopen the evidence in this case because on June 13, 1984, an article published in the *Wall Street Journal* stated that the federal government itself had violated federal price controls in the sale of oil from wells on federal lands.[17] The district court denied the motion upon the ground that equitable defenses would not be applied to block suits by the United States when such would "frustrate the purpose of its laws or to thwart public policy." *Pan American Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734, 747 (1927). *See also, United States v. City of Milwaukee*, 395 F.Supp. 725, 727 (E.D.Wisc.1975).

 Whether an equitable defense is available to a party is a question addressed to the discretion of the trial court. *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337 (10th Cir.1982). Given the nature of the public interest in equitable and fair enforcement of the ESA and EPAA, together with the fact of Sutton's "brazen disregard for and violation of the tier certification requirements", we find that the trial court did not abuse its discretion in denying the motion to reopen the evidence.

We now turn to the amount of the judgment for restitution which was awarded in this action.

The defendants complain that the government's audit was inaccurate and unreliable, providing no basis for a calculation of violation amount. As previously noted, the trial court found that the certification audit methodology "was reasonable and essentially accurate" and that conclusion is supported by evidence, and not clearly erroneous. It is to be noted that defendants offered no alternative certification audit to rebut this evidence.

The government contends that the restitution award should be increased to effect what it terms "full restitution" in this action.

In its amended complaint, the DOE computed a miscertification violation in the amount of $711,352,450.17,[18] an amount which reflected the difference between the prices defendants actually paid for the miscertified crude oil. At the request of the court, the government prepared and presented several alternative remedial calculations for the court's consideration. These are summarized in PX 304, R. 19848–81.[19]

The trial court ultimately based its award upon total profits realized by defendants through their miscertification scheme. In this respect, the court took into account defendants' practice of selling all tiers of crude oil at one averaged price with a markup, and this of course resulted in losses on some sales of oil. The court's specific findings in this regard were as follows:

> As a result of the defendants' crude oil purchase and sale policies and practices of miscertification, profits were realized by the defendants of $210,736,532.92. (PX-310) This sum of $210,736,532.92 allows the defendants credit for sales of uncontrolled (stripper or foreign) crude

---

17. According to defendants, an inspection of records filed in *Plateau, Inc. v. DOE*, No. C-82-0501, in federal court in Wyoming would reveal that the Interior Department "not only overcharged refiners but flagrantly violated the certification regulation, 10 C.F.R. Sec. 212.131." The government reports that the Office of Hearing and Appeals of the DOE has determined there were no certification violations.

18. This violation amount would be $696,063,-142.16 if transactions attributable to the 2% of the grand jury documents obtained in violation of Rule 6(e) are excluded.

19. These calculations included figures on defendants' illegal profits on "upward miscertification" of crude oil; the entitlements impact of defendants' miscertifications; total profits on all miscertified or uncertified crude oil, using weighted average costs/and/or selling prices; profits on upwardly miscertified or uncertified barrels based upon an "average profit" per individual sales invoice; and special subpart F and L pricing, analyses involving computations upon a "transaction basis" and upon a "weighted average basis" for certain periods from May, 1976 through December 1977.

oil as well as some other crude oil which defendants sold for substantially less per barrel price than it paid, which was brought about principally by the tier price averaging scheme discussed in paragraph 23 above....

The plaintiffs' claim seeks restitution for unjust enrichment. The defendants should be required to disgorge the amount of profit they have been unjustly enriched due to the crude oil sale certification violations. This sum is the amount of the profits realized by defendants from implementation of their crude oil miscertification scheme which is the sum of $210,736,732.92.... (F/F 41, 42)

■ This action is not, of course, a suit for damages. It is an equitable action, designed to make the defendants "disgorge" their unjust enrichment. The amount of the judgment rendered in this action is supported by the evidence, it is equitable in nature, and we find no error.

■ The defendant Robert Sutton claims that if he is to be held personally liable, then his liability should be no more than the amount of his "excess compensation"—a figure which he claims to be in the amount of $1,986,900. The record reflects that Sutton's personal benefits included not only "excessive salaries," but far greater amounts in the form of unpaid loans, personal use of corporate assets, etc. Sutton's liability for his own tortious conduct is certainly not to be limited to the money he actually put in his pocket. A person who is the "animating force" for regulatory violations is fully liable even though he does not personally receive all benefits of his illegal activities. *See Sauder v. Department of Energy*, 648 F.2d 1341, (TECA 1981), and *United States v. Exxon Corp., supra*, 773 F.2d 1240, 1269–1273.

■ Finally, we find that the award of prejudgment interest in this action was entirely correct. We refer the parties to our discussion of this aspect of restitution in the *Exxon* case, *supra*, 773 F.2d 1240, at pp. 1277–1279. In this instance, the trial court determined that interest would be based upon the schedule of interest rates applied by the DOE in administrative enforcement actions after February, 1980. This is the rate adopted and approved in the *Exxon* case.

VIII. *The Remedy*

Upon the basis of trial testimony, the district court determined the effect of defendant's miscertifications upon the entitlements program:

Defendants' upward miscertifications decreased the volume of domestic price-controlled crude oil available to refiners and reported to the Old Oil Allocation (Entitlements) Program, thus artificially decreasing the benefits to be distributed by the Entitlements Program and increasing the post-entitlement cost of all crude oil to all domestic refiners.... Defendants' upward certifications also tended to increase the disparities in refiners' crude oil costs which the Entitlements Program was intended to reduce.... Upward miscertifications, by removing old oil from the entitlements system reduced the entitlements 'subsidy', thereby increasing the post-entitlements crude oil costs to all refiners.... Upward miscertifications also had the effect of increasing the prices of refined petroleum products, although due to the economic complexities it is difficult, if not impossible, to determine the precise amount of that price increase.... (F/F 43)

The trial court recognized that refiners could pass through these increased costs to their customers, and their customers to their customers, through the chain of commerce to the ultimate consumer of motor gasoline, home heating oil, and other petroleum products, the result being that the ultimate loser was the petroleum products consuming public.

■ Under these circumstances, the district court ordered that the proceeds of the restitution judgment be placed in an escrow fund for subsequent distribution to the states for use in one or more of three energy conservation programs. These programs are for the weatherization of public

buildings under Part A of the Energy Conservation in Existing Buildings Act of 1976, 42 U.S.C. Secs. 6861 et seq.; energy conservation programs for schools and hospitals under Part G of Title III of the Energy Policy and Conservation Act, 42 U.S.C. Sec. 6371 et seq., and financial assistance for low income families under the Low Income Home Energy Assistance Act of 1981, 42 U.S.C. Sec. 8621, et seq.

Under the reasoning set out in our decision in *United States v. Exxon Corp., supra*, 773 F.2d at pp. 1283–1287, we find that the district court exercised its discretion in a reasonable manner by ordering that the restitution judgment be distributed to the states for funding programs designed to benefit public energy consumers. We repeat our observation set out in *Exxon, supra*, 773 F.2d at 1287:

> While other remedies might have been adopted by the trial court, the remedy chosen avoids further administrative delay and confusion, with additional costs, it prevents the frustration of congressional objectives in securing prompt enforcement of what has been denominated as 'emergency' price regulations, and it is a reasonable means to protect the public interest.

Under all of the circumstances presented in this record, we conclude that the trial court did not abuse its discretion in fashioning its remedy.

The Judgment of the District Court is AFFIRMED in all respects.

POINTER, Judge, concurring in part, dissenting in part.

As noted in my dissent in *Citronelle-Mobile Gathering, Inc. v. Edwards*[1] and echoed by my vote for rehearing en banc of *United States v. Exxon Corp.*[2] I believe that this court distorts the principles of restitution authorized by the statute when it permits a search for worthy beneficiaries of an award of unjust enrichment. However, as this court has rejected that position, I do not dissent on that basis and, rather, write under the constraint that the case *sub judice* is properly treated as one for restitution subject to broad equitable powers of the trial court.

In this light, I agree that the trial court did not err in denying the defendants a trial by jury and selecting suitable persons to receive the defendants' ill-gotten gains. I also concur, in general, with those portions of the majority's opinion upholding the trial court on such matters as (1) the validity of the statute and regulations; (2) the admission of evidence (other than grand jury materials);[3] the finding of gross miscertifications by the defendants; (4) the imposition of individual liability on Robert Sutton,[4] not limited to his "excess" compensation; (5) the rejection of defenses based on double jeopardy, statute of limitations, and "unclean hands"; and (6) the allowance of prejudgment interest.

In two respects, however, I must dissent. In my view, the case should be remanded for further consideration of the amount of the award.

### Grand Jury Documents

As discussed in the majority opinion, the government utilized in this case a large number of documents obtained in violation

---

1. 669 F.2d 717, 723 (TECA), *cert. denied*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).

2. 773 F.2d 1240 (TECA 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), *reh'g denied*, —— U.S. ——, 106 S.Ct. 1526, 89 L.Ed.2d 923 (1986).

3. I would not cite Federal Rule of Evidence 803(24) as a basis for upholding the admission of PX1, because the government did not satisfy 803(24)(B) or give the advance notice required by the last sentence of that Rule. The exhibit was, however, admissible under Rule 803(6) for

the reasons given in the majority's opinion. It should be noted that the third-party "interrogatories" which provided the foundation for the source documents were, by agreement of counsel, used in lieu of (and with the same effect as) depositions on written questions.

4. Although I do not believe that liability may be imposed on Sutton under the statute premised upon "his own tortious conduct," I agree that liability was properly imposed on him under the statute by "piercing the corporate veil(s)."

of Fed.R.Crim.P. 6(e) as construed in *United States v. Sells Engineering Inc.*[5] A few of these documents—affecting approximately 2% of the transactions in dispute—were suppressed at the trial, a ruling which this court is affirming as correct. The other documents were, however, admitted in evidence and indeed relied upon to determine the amount of the award, a ruling which this court is also affirming as correct.

The basic rationale for this distinction in treatment is sound and, indeed, not challenged by the appellants: the government should not be precluded in a civil action from using information that was presented in evidence at the prior criminal trial, even though it obtained that information in violation of Fed.R.Crim.P. 6(e). Exhibits 27 and 53 became matters of public record when they were received without qualification in the criminal trial of Robert Sutton, and the trial court properly refused to suppress the information derived from those documents when offered in the present case. Approximately 40% of the unlawful profits found by the trial court was based on those documents and accordingly should be affirmed.

I do disagree, however, about certain of the documents on which approximately 58% of the award is based. Specific data—namely, the number of barrels bought and sold and their certifications—were extracted from these documents and incorporated into summary exhibits 80 and 81, which were then admitted in evidence under Fed. R.Evid. 1006 at the criminal trial.[6] However, the documents themselves were not introduced or otherwise made public in the criminal trial, nor were items of information contained in those documents that are critical to the restitution award—namely, the prices of various transactions.[7]

In holding that these documents were no longer subject to the restrictions of Fed.R. Crim.P. 6(e), the majority explains that the documents had been made available to Sutton and his counsel for examination both before and during the criminal trial. This fact, however, provides no sound basis for disregarding the proscriptions of Rule 6(e). Indeed, in the *Sells* case, as is often the situation, the documents in question were the defendants' own records, of which they presumably had copies. Nor can it be said that these documents became a matter of public record and inspection merely be being produced in the courtroom at the criminal trial for Sutton's examination and use.

I would remand the case for a recalculation of the restitution award, eliminating from consideration information derived from documents obtained in violation of Rule 6(e) except to the extent that information was publicly revealed during the prior criminal trial.[8]

---

5. 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983).

6. Exhibits 80 and 81 were simply charts that aggregated for 1979 and 1980, respectively, the total number of barrels bought and sold in those years, subdivided into the categories of "old," "new," and "stripper (foreign & other)."

7. The majority opinion recites that the summaries "reflected and summed up the contents of all of these documents." A more accurate statement would be that the summaries "reflected and summed up certain items of information from all of these documents"—and it should be emphasized that information critical to the present case was not reflected in those summaries.

8. The majority opinion recites that the documents "were the subject of extensive cross-examination", a point made by the government

(Appellee's brief, p. 78). The portion of the criminal transcript cited—some 14 pages—reflects, however, not cross examination using or respecting the documents, but rather cross examination of the prosecution's witness involving some monthly worksheets that had been used as an intermediate step in preparing the summaries. The worksheets were not introduced in evidence and only on two occasions during this examination was any mention made about prices—once when the witness stated he was unable to testify whether Sutton's company ever received "stripper" prices for stripper oil, and later when the witness acknowledged that Sutton's company had been charged as high as $45 a barrel for oil. No sound argument can be made that the proscriptions of Rule 6(e) were somehow waived or abrogated by this cross examination.

### Methodology of Calculation

In calculating the liability of the defendants, the trial court determined an *average* profit-per-barrel, ascertained by considering both profitable and unprofitable sales, and multiplied that figure by the number of miscertified barrels. The government on cross-appeal asserts that only the particular transactions involving unlawful profits should have been used, raising the amount before interest from approximately $211 million to approximately $700 million. I agree with the majority that—given the defendants' scheme of selling at an averaged price, resulting in some losses which reduced their overall profits—the trial court's basic approach for determining the amount of unjust enrichment was supported by the evidence and within its equitable discretion. I therefore concur in denying the cross-appeal on this issue.

In one respect, however, the methodology used by the trial court was internally inconsistent, and the position on this issue advanced by the government on cross-appeal is correct. Having determined because of the nature of the scheme practiced by the defendants that all of the transactions, both profitable and unprofitable, should be taken into account in determining the average profit per barrel, the trial court should have multiplied this amount by all of the barrels sold, not just those which had been upwardly miscertified. This adjustment—in view of the affirmance by the majority of the trial court's exclusion under Rule 6(e) of only 2% of the documents—would raise the amount of the award, before adding interest, from $210,736,732.92 to $227,254,951.01. I would, of course, call for this upward adjustment to be made after suppressing substantially more documents under Rule 6(e).

### Conclusion

I would remand the case for recalculation of the amount of the award, suppressing additional documents obtained in violation of Rule 6(e) but taking into account under the trial court's formula all sales supported by the remaining evidence. In other respects I join with the majority in affirming the trial court.