**MID–AMERICA DAIRYMEN, INC., Appellant,**

v.

**John S. HERRINGTON, Secretary of Energy, Appellee.**

No. 10–79.

Temporary Emergency Court of Appeals.

Argued Nov. 14, 1988.

Decided April 19, 1989.

Rehearing and Rehearing En Banc Denied June 23, 1989.

Philip P. Kalodner, Philadelphia, Pa., for appellant Mid–America Dairymen, Inc. Wayne H. Hoecker, Gage & Tucker, Kansas City, Mo. was on the brief.

Stephen C. Skubel, Office of the General Counsel, Dept. of Energy, Washington, D.C., for appellee John S. Herrington, Secretary of Energy. Marc Johnston of the same office was on the brief.

Philip P. Kalodner, Philadelphia, Pa., filed Brief on behalf of *amicus curiae* Boise Cascade Corp., Burlington Industries, Inc., and Packaging Corp. of America.

Before Chief Judge GARZA, Judges CHRISTENSEN,* and BROWN.

WESLEY E. BROWN, Judge.

Mid–America Dairymen filed a claim for crude oil refunds under DOE Subpart V procedures, 10 C.F.R., Part 205, Subpart V. The Office of Hearing and Appeals (OHA) denied the claim because a Release and Waiver had been executed by its affiliate, Roberts Dairy Company, in connection with Roberts' claim for a share in an escrow fund held by the District Court in connection with the settlement of *In re: The Department of Energy Stripper Well Exemption Litigation*, M.D.L. No. 378 (District of Kansas).

In this action to review the OHA decision, Mid–America appeals from an Order of the District Court granting the Motion for Summary Judgment filed by John S. Herrington, Secretary of the Department of Energy. 704 F.Supp. 198.

None of the relevant facts involved in the ruling of the District Court are controverted. As found and noted by the District Court, they may be summarized as follows:

Mid–America owns more than 49% of the capital stock issued by the Roberts Dairy Company.

On December 5, 1986, Roberts Dairy, through its president, Randall Winters, submitted a claim and waiver and release for the purpose of obtaining a refund from the Surface Transporters Escrow account in the *Stripper Well* M.D.L. litigation. This waived and released all claims by Roberts and "its parents, subsidiaries, affil-

---

* Judge A. Sherman Christensen participated in the arguments and conferences of the case but has asked to be relieved from further participation for health reasons. The case is decided by a quorum.

iates, successors, and assigns" to crude oil refunds under DOE Subpart V procedures, 10 C.F.R., Part 205, Subpart V.

In the claim form and waiver, Roberts Dairy further agreed "to be bound by the Settlement Agreement" as though it had executed the Agreement itself.

Paragraph VI.A of the Settlement Agreement in the MDL litigation defined the term "affiliate" as including a firm "which controls, is controlled by, or is under common control with" a person, executing a waiver and release. The term "control" is defined as including the ownership of more than 49% of the shares of stock of a corporation.

Mid–America acquired the issued and outstanding capital stock of Roberts Dairy in December, 1980. The stock was purchased for the sum of $10.00 after Roberts Dairy failed to pay for unprocessed milk it had received from Mid–America.

Shortly after the stock was acquired, Robert Quinn, an individual selected by Mid–America, was employed by Roberts as its general manager and chief operating officer.

In June, 1981, Roberts was reorganized by a merger of two other corporations. After this—Prairie Farms Dairy, Inc., owned approximately 50% of the issued and outstanding voting stock of Roberts Dairy. Under an agreement, Prairie Farms assumed the responsibility for managing the day to day business of Roberts Dairy under a management contract with Mid–America. Mr. Quinn was no longer employed by Roberts Dairy.

The Roberts Dairy Board of Directors has ten members. Two of them are also members of the Mid–America Board of Directors.

As of the date of its last balance sheet, Roberts Dairy was financed by approximately $12,158,000 in equity capital. The ratio of equity to assets was approximately 53.6%. At that time it had no interest bearing debt.

Roberts Dairy maintains separate accounting records, prepares separate financial reports and has its own independent auditing firm.

Roberts Dairy prepares and files separate income tax returns, its management functions with a high degree of autonomy, and it is responsible for its own business goals.

Roberts Dairy buys approximately 41 million pounds of unprocessed milk each month. Mid–America sells approximately 90% of the unprocessed milk received by Roberts. Mid–America sells about 27 million pounds of unprocessed milk per month. Roberts Dairy buys about 13.7% of this milk.

Roberts Dairy processes and distributes fluid milk and other dairy products, selling wholesale, primarily to grocery stores and other retail outlets.

Roberts Dairy does not act as an agent for Mid–America; it employs its own individuals. Prairie Farms provides management oversight for Roberts Dairy. Mid–America is not involved in the day to day operations of Roberts Dairy.

Under these facts, this appeal involves the proper interpretation of, and the effect of the Settlement Agreement, the Surface Transporters Order, and the Surface Transporters Claim Form and Waiver, heretofore approved by the Kansas District Court in *In re The Department of Energy Stripper Well Exemption Litigation*, M.D.L. No. 378, 653 F.Supp. 108 (D.C.Kan.1986). The issue presented here is whether the District Court correctly affirmed the OHA determination that the submission of a Surface Transporters Claim Form and Waiver under the *Stripper Well* Settlement Agreement waived the Subpart V refund claims of the submitting firm and its affiliates.

Mid–America contends that the waiver and release must be read in connection with the negotiations which led to the Settlement Agreement in the M.D.L. litigation, and that the release was effective only with respect to the specific gallons of oil product which were the subject matter of the Roberts claim.

Mid–America did not present the "gallonage" argument, as such, to the District

Court, and the Secretary suggests that this appeal should be dismissed because it is based on an argument that was not presented below. However, the District Court specifically found that the Mid–America claim was barred under the "plain meaning" of the Settlement Agreement and waiver—and thus—by implication—found that there was no "internal inconsistency" or ambiguity of language in the provisions of the agreement which are at issue in this case. In our *de novo* review of the record[1] we likewise find that there is no inconsistency or ambiguity to be found in the waiver and release provisions.[2]

Following our review of the record against the background of the *Stripper Well* litigation, and its ultimate settlement, we determine that the District Court's ruling should be affirmed because it correctly interpreted and enforced the provisions of that Settlement Agreement and subsequent orders relating to the establishment of various escrow accounts, and in particular, the Order establishing the Surface Transporters Escrow Fund which was the fund pertinent to the Roberts claims here in question.

## THE STRIPPER WELL LITIGATION

This multidistrict litigation presented the issue of the validity of the Federal Energy Administration (now the Department of Energy) rule interpreting the "stripper well exemption" as excluding injection wells from well count when computing crude petroleum production from stripper well leases.

In a decision reversing the District Court of Kansas, this Court determined that the agency's decision to exclude injection wells from the well count for the purposes of determining average daily production was valid. *In Re: Department of Energy Stripper Well Exemption Lit.* (TECA

1982) 690 F.2d 1375, *cert. den.*, 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983).

While the District Court had initially enjoined the Department of Energy from enforcing its rule, it ordered the producers to deposit into escrow the difference between controlled and stripper well prices during the pendency of the litigation. At the time of our ruling in 1982, the *Stripper Well* escrow fund contained over one billion dollars.

The effect of our 1982 decision was a determination that the funds deposited in escrow were overcharges collected by the producers because of violation of the petroleum pricing regulations.

In carrying out our mandate the District Court undertook the task to determine the appropriate distribution of the escrowed funds which it described as "... monumental interpleader action with potential classes and subclasses" (578 F.Supp. 589).

The District Court then referred the issue to the Department of Energy, since the tracing of overcharges involved complicated and technical questions of fact, particularly within the expertise of the agency which had developed procedures for refund claims in overcharge cases generally within its jurisdiction. The referral was solely for resolution of factual questions "concerning the particularized impact of the overcharges," and the court retained jurisdiction to make the final determination on the disposition of the escrow fund. 578 F.Supp. at 596.

Settlement negotiations followed in the case, and on July 7, 1986, the District Court adopted and approved the Settlement Agreement reached by the parties, with certain modifications. *In Re: Department of Energy Stripper Well Exemption Lit.* (D.C.Kan.1986) 653 F.Supp. 108.

---

1. Under our recent decision in *In Re: Department of Energy Stripper Well Exemption Lit.*, (TECA 1988) 855 F.2d 865, 868, (C.A.Emp.App. 1988) we will consider the District Court's interpretation of the Settlement Agreement *de novo*, as a matter of law.

2. In this instance, we likewise adopt the rule that "(a) rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with (the) policy" that rules of practice and procedure "are devised to promote the ends of justice, not to defeat them" *Hormel v. Helvering* (1941) 312 U.S. 552, 557, 61 S.Ct. 719, 723, 85 L.Ed. 1037 at 1041 (1941).

The Settlement Agreement represented "a comprehensive charter for the resolution of the immediate matter of satisfactory disbursement of the escrow held under the Court's direction, as well as two related matters: distribution of crude oil overcharge funds in other cases, and settlement of litigation concerning the Department of Energy ("DOE") Entitlements Program." 653 F.Supp. 108.

The parties to the agreement included the Department of Energy, the States and Territories, the Refiners, the Resellers, the Retailers, the Agricultural Cooperatives, the Airlines, the Surface Transporters, and the Utilities. The Agreement covered three matters: 1) the distribution of the District Court's escrow and other funds relating to the stripper well issue; 2) distribution of crude oil overcharges in cases unrelated to the stripper well litigations; and 3) resolution of litigation concerning the DOE Entitlements Program. The DOE estimated that the total of all the funds would be between four and five billion dollars, including the Stripper Well escrow which amounted to over one billion dollars at the time of the settlement.

Under the Settlement Agreement, separate escrow accounts were set up for the various claimants in these initial amounts:

| | |
|---|---|
| Refiners | $298,514,000 |
| Retailers | 53,460,694 |
| Resellers | 58,460,694 |
| Agricultural Cooperatives | 45,476,983 |
| Airlines | 38,987,129 |
| Surface Transporters | 10,750,000 |
| Rail and Water Transporters | 9,750,000 |
| Utilities | 5,250,000 |

The balance in the Stripper Well escrow, including whatever deficiency funds were collected in the future, was to be divided between the United States and the States for energy related uses for the public benefit.

**3.** The Surface Transporters "include all commercial motor vehicle surface transporters of *persons or property including 'for hire' carriage and private fleet transportation, regulated and unregulated, and specifically (include) ... trucks, buses, and taxicabs, who utilized oil*

Under the Settlement Agreement, the DOE provided for special refund proceedings pursuant to 10 C.F.R. Subpart V for *nonsettling,* waiving claimants, so that they could submit their claims of injury arising from alleged crude oil violations. *Ibid.,* 653 F.Supp. at 113.

All parties receiving funds under the Settlement Agreement were required to waive all future claims to crude oil refunds.

The parties in this case are interested in the Surface Transporters (ST) Escrow Fund.[3]

Part III of the Settlement Agreement provided that the parties agreed to "release, waive, and ... to withdraw *any* claims before any Federal or state court or agency" (emphasis supplied) against funds which had been, or would be paid to satisfy enforcement actions, including recoveries of funds within the DOE's control, or in escrows created or to be created by the DOE, any court or agency. (Part III.A.1.)

Paragraph A.3. of Part III of the Settlement Agreement contained this specific provision regarding releases:

"3. *Other Releases.* As a condition to receiving any payment from their respective Escrows, each Reseller, Retailer, Airline, Co-op, Surface Transporter and Utility claimant, seeking payment from such an Escrow shall execute and deliver the waiver and release pertinent to it, including a waiver and release of *all* claims which a Party waives under Paragraph III.A.1. in the form set forth in Exhibits B, C, D, E, F, or G hereto, which shall be deemed to be effective upon the Payment Date. Upon receipt of any payment from their respective Escrows each Reseller, Retailer, Airline, Co-op, Surface Transporter and Utility claimant ... shall also withdraw all covered claims for funds based upon Alleged Crude Oil Violations, ... pending before any court or Federal agency...." (Emphasis supplied).[4]

products in such operation at any time during the Settlement Period." Settlement Agreement Part I, H., page 2, Appendix, Mid–America brief.

**4.** Certain specific pending claims were excluded from the release and waiver provisions of the

Part VI of the Settlement Agreement provided that it would be binding upon all parties who executed waivers and releases pursuant to the agreement:

"A. *Agreement Binding.* The provisions of this Agreement, which shall include the Exhibits hereto as though fully set forth in the text hereof, shall be binding upon (1) all the Parties hereto *and (2) all Persons executing waivers or releases pursuant to this Agreement, and with respect to such Parties and Persons, their Affiliates, subsidiaries, member-patrons and their owners,* and their member-patrons and their owners, officers, agents, attorneys and any other Persons while acting under their direction or control. As used herein, an 'Affiliate' of any Party includes any Person (and the successors and assigns of such Person) which controls, is controlled by or is under common control with such Party. For this purpose, 'control' means the power ... by contract, partnership agreement, stock ownership or otherwise, to control the policies and business operations of a Person, including without limitation, the ownership, directly or indirectly (through one or more intermediaries) of shares of stock having the right to elect a majority of the Board of Directors of a corporate Person, *or the ownership (on the Payment Date), directly or indirectly (through one or more intermediaries), of more than 49 percent of a Person.*" (Emphasis supplied).

As noted in Part III.A.3. of the Agreement, all parties claiming payment from escrow funds were required to execute and deliver a waiver and release. An Order establishing the Surface Transporters Escrow Fund was entered by the District Court in the Stripper Well Litigation on August 7, 1986. That Order provided that the Escrow Administrator, following notification to all potential Surface Transporter claimants through advertisement, would process claims in accordance with procedures set forth at 10 C.F.R. Part 205, Subpart V. A properly executed claim form and release in the form provided in Attachment A (to the Order) had to be filed with the Escrow Administrator in order for the claim to be considered. The Surface Transporters Escrow Fund was to be divided among claimants proportionately to volume usage and was to be fully disbursed among all successful Surface Transporter claimants.

From determinations by the Escrow Administrator, there was no appeal, but the Administrator was to provide an opportunity for claimants to seek reconsideration. "A Surface Transporter Claimant (had) no other remedy save and except an application to (the) Court upon the ground that a determination by the Escrow Administrator was made in bad faith and seeking the correction thereof. No correction or adjustment to any determination by the Escrow Administrator or any other remedy or payment (would) be considered or made by (the) Court."

The Settlement Claim Form and Waiver applicable to the Surface Transporters Escrow Fund contained the following pertinent provisions:

### "SURFACE TRANSPORTERS WAIVER AND RELEASE"

"I, _____, hereby declare under penalty of perjury as follows:

1. I am the _____
(Title)
of _____
(Surface Transporter Claimant)
_____ (Grantor) and execute this Verification and Waiver Release on behalf of that Grantor. I am duly authorized by the Grantor to execute this Surface Transporters Waiver and Release, and to acknowledge and agree that said Grantors are, as a result of my execution hereof, bound by this Surface Transporters Waiver and Release.

2. I have read and am familiar with the terms of the Settlement Agreement dated _____, 1986, relating to *In re: Department of Energy, Stripper Well*

---

settlement agreement, and the waiver did not apply to Section 210 private claims.

*Exemption Litigation,* M.D.L. No. 378, (Settlement Agreement) and certain other cases including, but not limited to those specified in the Settlement Agreement. I have also read and am familiar with the contents of the Order Establishing Surface Transporters Escrow and Prescribing Provisions for the Administration of the Fund.

\* \* \* \* \* \*

5. This Waiver and Release is made by Grantor in consideration of the Settlement Agreement.

6. Execution of this Waiver and Release shall be deemed to be execution of the Settlement Agreement and Grantor agrees to be bound by the terms of the Settlement Agreement as though the Settlement Agreement had actually been executed by Grantor. Terms used in the Settlement Agreement shall have the same meaning when used herein.

7. Except as set forth in Paragraph 8 herein:[5]

" . . .

(a) Grantor hereby releases, and waives *all* Grantor's existing and future claims whether assertable at law or in equity, and whether known or unknown that fall within any one or more of the following classes, except such claims as are specifically excepted from this Waiver and Release:

(1) all claims for any and all funds deposited in the M.D.L. 378 Escrow and claims for any funds in the DOE/Amoco Stripper Fund;

(2) all present and future claims asserting rights to share in existing or future monies paid, ordered to be paid, or held for payment as restitution as a result of any judicial or administrative proceeding relating to the federal mandatory allocation and price regulations applicable to crude oil, and the entitlements program (herein Alleged Crude Oil Violations).

\* \* \* \* \* \*

9. *This Waiver and Release shall be binding upon the Grantor, its parents, subsidiaries, affiliates, successors and assigns.*

10. Except for the matters described in Paragraph 8 above, Grantor hereby agrees to withdraw and to take all necessary steps to file appropriate withdrawals of *and all* claims it now has or hereinafter may have for funds in any Court or agency proceedings, *including "Subpart V" proceedings,* where such funds are related to Alleged Crude Oil Violations and to notify the Escrow Administrator when it has done so. *Grantor agrees it will not file any such claims for refund of Alleged Crude Oil Violations in these or similar proceedings in the future.* In the absence of the filing of such a withdrawal, any party to such a proceeding or to the Settlement Agreement may file a copy of the Settlement Agreement and of this executed Claim Form and Release and Waiver "as evidence of the waiver (of) all such claims." (Emphasis supplied).

## THE ROBERTS DAIRY–MID–AMERICA CLAIMS

The District Court appointed the Office of Hearings and Appeals (OHA) of the Department of Energy to administer refund proceedings for two groups of claimants—the Surface Transporters (ST), and the Rail and Water Transporters (RWT). In addition to acting for the District Court in the *Stripper Well* escrow funds, the OHA published an Order, 51 Fed.Reg. 27899, August 4, 1986, stating its readiness to accept Applications for Refunds in Subpart V proceedings from injured parties who had not waived their claims by electing to participate in one of the *Stripper Well* refund proceedings. See *Roberts Dairy Co., et al.,* 16 DOE Paragraph 85, 573 (October 28, 1987). (Record, p. 41).

On December 4, 1986, Randall E. Winters, President of Roberts Dairy Company, executed a Surface Transporters Waiver

---

**5.** Paragraph 8 noted that the matters in *Getty Oil Co.,* OHA Case No. HRR–0074 and related cases were excluded from the Agreement.

and Release in connection with a claim for Roberts Dairy Company for 4,237,036 gallons of oil products purchased during the 1973–1981 settlement period. In executing this waiver and release, he represented that he was authorized to do so, and that the waiver and release would be binding upon Roberts, its parents, subsidiaries, affiliates, successors and assigns.

Five months later, on May 1, 1987, the plaintiff, Mid–America Dairymen, Inc. submitted a claim in the Subpart V crude oil proceedings pending before the OHA. In its application requesting a refund based upon purchases of 47,588,398 gallons of petroleum products, Mid–America represented that it, "its parent, subsidiaries, affiliates, successors or assignees (have not) waived any rights it may have to receive a refund." (Record, p. 42, 16 DOE Paragraph 85,573).

In an Opinion issued October 28, 1987, the OHA determined that Roberts had waived Mid–America's right to receive a refund under Subpart V, under the clear terms of the Waiver and Release, and the Settlement Agreement which ended the *Stripper Well* litigation. The consequences of Roberts' release were described in this manner:

"Thus, an applicant must choose between obtaining relief under the M.D.L. 378 Escrows or under the Subpart V process. Once an applicant files an Application for Refund from a M.D.L. Escrow, it is precluded from receiving a refund in crude oil refund proceedings conducted under the provisions of 10 C.F.R. Part 205, Subpart V. This preclusion includes that party's affiliates, subsidiaries, successors and assigns." (Supra, 16 DOE Paragraph 85,573, at Record, p. 43).

In accordance with this finding, the OHA approved the application for refund filed by Roberts Dairy Company from the Surface Transporters Escrow account, and denied and dismissed the Subpart V application for refund filed by Mid–America Dairymen, Inc. A Motion to Reconsider was denied by the OHA on January 11, 1988. *Mid–America Dairymen, Inc.*, 17 DOE Paragraph 85,015, Record, at p. 46. In this motion, Mid–America contended that it had done nothing voluntary or intentional to relinquish its Subpart V claim, and that Roberts was not authorized to waive Mid–America's rights. The OHA found that Roberts was the entity which voluntarily relinquished Mid–America's claim when it signed the waiver—even though Mid–America may not have had any knowledge—because Mid–America was bound by the action of its affiliate because of its ownership interest. As to the authority of Roberts to act for Mid–America, the OHA noted that:

"The language of the ST Waiver clearly put Roberts on notice that it was waiving both its own rights and the rights of any other firm with which it was affiliated. The president of Roberts either knew or should have known that in signing the ST Waiver, he was affecting the rights of Mid–America. If he did not understand the import of that language, he should have sought legal advice. It is not the duty of the OHA to ascertain the precise scope of authority of all of the individuals that filed claims in the ST and RWT proceedings, especially when those individuals clearly appear to have the authority to represent a company before the agency.... For this reason, the ST Waiver included a notarized statement to the effect that the signatory was authorized to represent his firm and to execute the waiver claim form." (Id. at Record, p. 47).

In granting summary judgment to the Secretary of Energy in this case, the District Court found that there was no allegation of bad faith on the part of the OHA, and that there was no indication that the agency had acted in an arbitrary or capricious manner, or that it had abused its discretion. Our independent examination of the record confirms those findings.

In ruling that the plain language of the Claim Form and Waiver executed by Roberts put Roberts on notice that it was also waiving Mid–America's Subpart V refund claim, the District Court noted its prior finding on a similar issue in a motion filed

by the Boise Cascade Corporation for review of decisions of OHA in refund proceedings. *In Re: The Department of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378 (D.C.Kan., Order of December 7, 1987). In that case, a trucking operation owned by Boise, which served Boise's paper mills, filed for refunds on 55 million gallons of product from the Surface Transporters Escrow Fund in the *Stripper Well* litigation. The OHA rejected Boise's claim in Subpart V proceedings on some 550 million gallons of No. 6 oil used in the production of paper at the mill. Boise Cascade then sought review in the District Court only on the issue of whether it could withdraw its Surface Transporters claim and thereby avoid dismissal of the Subpart V claim. The District Court enforced the waivers according to their plain meaning because "(t)he waiver of Subpart V claims was expressly made binding upon the ST or RWT refund applicant, 'its parents, subsidiaries, affiliates, successors and assigns.' The persons who executed the waivers stated under penalty of perjury that they were duly authorized to execute the waivers and they acknowledged that they were binding not only the applicant but also all affiliated entities." (Opinion and Order Sustaining Motion for Summary Judgment, at Record, p. 106).[6]

In this Court Mid–America contends that the Settlement Agreement contemplated that only one recovery could be made for each *gallon* of oil product, so the provisions binding affiliates to the release should be limited on a gallonage basis. In this respect, Mid–America claims that the

waiver and release executed by Roberts Dairy should extend only to the 4,237,036 gallons of oil products which were the subject matter of the Roberts' claim—and not to the entire 47,588,398 gallons which were the basis for the Mid–America claim in the Subpart V proceedings. According to Mid–America, this is the only interpretation which would make the Settlement Agreement "internally consistent."

Any view which would limit the effect of the waiver and release form executed by parties making claim to the *Stripper Well* escrow funds to affect only the gallonage claimed by the one making the waiver fails to take into account the very clear and unambiguous provisions throughout the Settlement Agreement and the Release and Waiver forms, that the one who executes the waiver releases *all claims* of affiliates to further recovery of overcharges in Subpart V proceedings.

The Settlement Agreement in M.D.L. No. 378 was just that—a hard fought, negotiated agreement between numerous parties, all with adverse interests, to reach a "global settlement" which would cover all aspects of the right to share in overcharge refund money attributable to oil product overcharges, no matter where those refund monies might be found. The Settlement Agreement was described by the District Court in these words:

"The settlement agreement currently before the Court represents a comprehensive charter for the resolution of the immediate matter of satisfactory disbursement of the escrow held under the

---

6. The OHA expressly relied on the District Court's opinion in the Boise Cascade matter in rejecting Mid–America's claim for Subpart V refunds. *Boise Cascade Corporation,* 16 DOE Paragraph 85,214 (1987).

By leave of this Court Boise Cascade Corporation, Burlington Industries, Inc., and Packaging Corporation of America have filed a brief as Amicus Curiae in this appeal. In the case of Burlington Industries, a subsidiary trucking operation sought and received refunds for 62 million gallons of oil products used in trucking operations from the Surface Transporters Escrow Fund and the OHA rejected Burlington's claim on Subpart V proceedings for a purchase of 400 million gallons of product used in textile manufacture. In the case of Packaging Corpo-

ration, a subsidiary operating a rail line serving one plant sought and received refunds from the *Stripper Well* escrow funds on less than 1 million gallons of oil products and the OHA rejected a Subpart V claim on 150 million gallons of oil product used largely in manufacturing paper.

Burlington and Packaging Corporation did not seek judicial review from the rejection of their claims before the OHA. Boise Cascade did not appeal the unfavorable decision of the District Court. We understand that these three companies have retained new counsel and have filed new claims in Subpart V proceedings, together with motions for reconsideration of OHA prior decisions rejecting their claims.

Court's direction, as well as two related matters: distribution of crude oil overcharge funds in other cases, and settlement of litigation concerning the Department of Energy ... Entitlements Program." *In re: Dept. of Energy Stripper Well Exemption Lit., supra,* 653 F.Supp. at 109.

The plain language of the Agreement and Waiver forms states that if you make claim to *Stripper Well* escrow funds, you may not make a claim to other overcharge recoveries, except in certain instances specifically mentioned in the Agreement.

The OHA has consistently held that the submission of a Surface Transporters Claim Form and Waiver constitutes a release of any Subpart V claims by both the one who executes the release, and its affiliates or subsidiaries. E.g., *Dairymen, Inc.,* 17 DOE Paragraph 85,549 (1988); *Florida Rock Industries, Inc.,* 17 DOE Paragraph 85,032 (1988); *Boise Cascade Corp.,* 16 DOE Paragraph 85,494 (1987); *Columbia Lighting, Inc.,* 16 DOE Paragraph 85,450 (1987); *American Cyanamid Co.,* 16 DOE, Paragraph 85,424 (1987); and see Proposed Decision and Order on Applications for Refund filed by the *City of New York, et al.,* Case Numbers: RF272–380 et al. (October 20, 1988). The *City of New York* case involved claims by 15 municipalities to Subpart V refunds. In each case, the Department of Energy found them to be barred by waivers and releases filed by various divisions of the cities in connection with claims made against the Refiners Escrow Fund in the *Stripper Well* litigation.[7]

We recently ruled that one who voluntarily executes a waiver and release and becomes a party to the Settlement Agreement in the *Stripper Well* litigation becomes bound by its terms. *In Re: Dept. of Energy Stripper Well Exemption Litigation* (TECA 1988) 853 F.2d 1579. There, Apex Oil Company did not participate in the *Stripper Well* litigation or in negotiating the Final Settlement Agreement, but since it was a participant in the DOE Entitlements Program, Apex was eligible to receive a share of the Refiners Escrow Fund. Apex signed a signature page to the Settlement Agreement and a Release of Claims and received payment from the Refiners Escrow. Apex then submitted a second claim as a Reseller, and when this was denied because Apex had already participated in the settlement as a Refiner, Apex sought judicial review of the decision of the Resellers Settlement Administrator. The District Court refused to review the decision since the Settlement Agreement and the Order establishing the Resellers Escrow Fund provided there should be no judicial review.

On appeal we found that Apex had clearly waived its right to judicial review. We noted that Apex had agreed to be bound by the agreement and had waived its right to judicial review twice—once when its President signed a Signature Page as a Refiner to the Settlement Agreement, and again when its Secretary signed the Resellers Verification Waiver and Release, which contained an explicit waiver of any right to seek review of or appeal final decisions of the Administrator except by appeal to a Referee. In ruling that Apex was bound by its waiver, we stated:

"In the case before us now, the Resellers Order stated that a prerequisite to participation in the Settlement was agreement that the Referee's decisions 'shall be final and binding on the claimant and shall not be subject to further review.' ... Further, it mandated that each claimant waive any right to appeal the Referee's decision ... By signing the verification waiver and release, Apex agreed to these stipulations. However meritorious its claim may be, Apex waived its right to appeal the Referee's decision." 853 F.2d at 1583–1584.

Here, there is no dispute that Roberts and Mid–America were affiliates within the

---

**7.** Mid–America's citation of *Union Pacific Railroad Company; Missouri Pacific Railroad Company,* 16 DOE, Paragraph 85,526 (1987) is unpersuasive. We understand that that case ruled that the Rail and Water Transporters Claim Form and Waiver could be interpreted as allowing independent affiliates of refiners to file applications in *other Stripper Well* escrows. This decision did not hold that affiliates could seek refunds in Subpart V proceedings.

meaning of the Settlement Agreement, and that Roberts Dairy executed the sworn claim form and waiver of rights prior to Mid–America's submission of a claim in Subpart V proceedings. These facts alone establish that the District Court correctly ruled that Mid–America's claim had been waived. Any limitation of the release on the basis of "gallonage" would require a complete re-writing of the Settlement Agreement, the Order Establishing the Surface Transporters Escrow Fund, and the accompanying release and waiver form. There is no "internal inconsistency" in the Settlement Agreement with reference to the waiver, and the language in that Agreement is clear and not ambiguous.[8] When Roberts executed the release and waiver, it released *all* of its claims, and *all* of the claims of any of its affiliates to any further participation in Subpart V refund proceedings, unless such claim was specifi-

cally exempted from coverage by other language contained in the Settlement Agreement. There was no language in that Agreement limiting waiver and release on a "gallonage basis."

Those parties making claims against the *Stripper Well* escrow funds and executing waivers and releases in connection with such claims must bear responsibility for, and accept the consequences of, their own decisions and elections of remedies.

The Decision and Order of the District Court is AFFIRMED.

---

8. Paragraph V.G. of the Final Settlement Agreement concerned DOE's responsibility to provide funds to pay entitlements exception relief "receive orders" which were outstanding at the time of the settlement. After the Settlement was approved, the States filed a Motion to enforce the DOE's obligations in Part V.G. The District Court found that the language of that Paragraph was clear and exhibited an intent that DOE's obligation operate retroactively. On appeal, we reviewed the interpretation *de novo* and found that there was ambiguity in some respects because of the absence of any retroactive effective date. We then considered extrinsic evidence, and affirmed the District Court upon a finding that the parties intended the provisions to be retroactive. *In Re: Dept. of Energy Stripper Well Exemption Lit.* (TECA 1988) 855 F.2d 865.

Contrary to the situation in that case, we find no ambiguity in the provisions relating to Roberts waiver and release of claims.