**CITY OF NEW YORK, Plaintiff,**

v.

**James D. WATKINS, et al., Defendants.**

**Civ. A. No. 89–2335–LFO.**

United States District Court,
District of Columbia.

Feb. 8, 1991.

---

David J. Shaffer, Mary E. Cassidy, Arnold & Porter, Washington, D.C., and Victor A. Kovner, Corp. Counsel of the City of New York, New York City, for plaintiff.

Thomas Millet, Judry L. Subar, Dept. of Justice, Civ. Div., and Stephen C. Skubel, Dept. of Energy, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

In May 1986, two New York City agencies, the Departments of Sanitation and Environmental Protection, applied for restitution for petroleum overcharges from an escrow fund created by an order issued in what is known as the "Stripper Well Litigation." *See, e.g., In re Department of Energy Stripper Well Exemption Litigation,* 690 F.2d 1375, 1377–80 (Temp.Emer.Ct. App.1982); the Departments later received refunds totalling $4,226. On April 16, 1982, and then again on June 29, 1988, the City applied for a refund of approximately $1 million from a different, though related, restitutionary fund administered by the Department of Energy's Office of Hearing and Appeals (OHA). The OHA denied this application on the ground that the earlier application for the *"Stripper Well* refund" waived the City's right to refunds from the fund administered by the OHA. *See* Decision and Order of the Department of Energy, *City of New York,* June 21, 1989 (Plaintiff's Motion for Summary Judgment, Exhibit F) [hereinafter, "Final Decision"]. The City of New York appealed that decision to this Court, and it now seeks summary judgment, *inter alia,* on the grounds

that the release upon which the OHA based its decision was not validly executed. Defendants James J. Watkins, the Secretary of Energy, and George Breznay, Director of the OHA, have filed a cross-motion for summary judgment. As explained below, the release was not validly executed. Accordingly, an accompanying order will deny defendants' motion, grant plaintiff's, and remand this matter to the OHA for further action.

### I.

Beginning with the Economic Stabilization Act of 1970, *see* Pub.L. No. 91–379, 84 Stat. 799, and continuing with the Emergency Petroleum Allocation Act of 1973, *see* 15 U.S.C. § 751 *et seq.* (1988), until the latter's expiration in 1981, the price and allocation of petroleum in this country were regulated by the federal government. Those controls did not, however, cover all petroleum produced in the country. Of particular interest here, oil produced from certain economically marginal properties, popularly known as "stripper well" leases, was not subject to regulation. *See* 15 U.S.C. § 753(e)(2) (1973).[1] Stripper well leases are properties that produced less than ten barrels per well during the preceding calendar year. *See id.*

In 1974, the Federal Energy Administration, the predecessor of the Department of Energy, issued regulations interpreting the so-called stripper well exemption. *See* Ruling 1974–29 (39 Fed.Reg. 44,414, Dec. 24, 1974). According to these regulations, injection wells, as well as any other wells not used to produce oil, could not be counted as wells for the purpose of calculating the number of barrels per well on a property. *See id.* Injection wells force fluids into an underground reservoir of oil in order to create pressure that will in turn increase production in nearby extraction wells. *Cf. In re Dep't of Energy Stripper Well Exemption Litigation,* 520 F.Supp. 1232,

---

**1.** That section provided that

The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States

from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well. 15 U.S.C. § 753(e)(2) (1973).

1276 (D.Kans.1981) (Appendix A) (presenting a diagram of a typical injection well).

Oil producers challenged this regulation, and the United States District Court for the District of Kansas originally found it to be invalid. *See id.* at 1275; *Energy Reserves Group, Inc. v. Federal Energy Admin.*, 447 F.Supp. 1135 (D.Kans.1978). Pending appeal, the District Court ordered the producers to deposit into a court-supervised escrow account the difference between the revenue that they received as the result of its ruling and the revenue that they would have received under the regulation. *See Stripper Well Exemption*, 520 F.Supp. at 1241, 1275. When the Temporary Emergency Court of Appeals ultimately affirmed the regulation in question, *see In re Dep't of Energy Stripper Well Exemption Litigation*, 690 F.2d 1375, the escrow account held $1.4 billion dollars in what had just been determined to be petroleum overcharges.

The District Court then set about determining how to distribute the money to the affected individuals and entities. *See In re Department of Energy Stripper Well Exemption Litigation*, 653 F.Supp. 108 (D.Kans.1986). At first, the Court investigated the possibility of tracing the overcharges directly to the affected parties and compensating them. After twenty-two days of hearings, the OHA determined that tracing was impossible. *See id.* at 110–11. Using econometric analysis, the OHA was, however, able to determine what percentage of the fund was attributable to different economic groups. *See id.* Based upon this analysis, the parties to the *Stripper Well* litigation, as well as numerous intervenors, negotiated the inaptly named Final Settlement Agreement.

That Agreement creates three separate restitutionary funds. The first compensates those most directly affected by the overcharges—refiners, retailers, airlines, investor-owned utilities, surface transporters, and rail and water transporters—through separate escrow accounts. *See* Final Settlement Agreement ¶¶ II.B. (Plaintiff's Motion for Summary Judgment, Exhibit A). Refunds from these escrow accounts are often referred to as *"Stripper Well* refunds." The second fund, administered by state and local authorities, compensates indirectly, for example through programs promoting energy conservation or assisting low income families with their utility bills. The final fund is not really a separate fund at all; instead, the residual funds from the Court's escrow account were placed in an already existing fund used by the DOE to compensate end-users for petroleum overcharges. *See* Order Implementing the DOE's Modified Statement of Restitutionary Policy Concerning Crude Oil Overcharges, 51 Fed.Reg. 29,689 (August 20, 1986). Because the DOE's end-user restitution program is administered under the authority of 10 C.F.R. Part 205, Subpart V, refunds from this program are generally known as "Subpart V refunds."

The Final Settlement Agreement provided that the parties would waive any further claims arising out of petroleum overcharging. *See* Final Settlement Agreement ¶ III.A.1. Because individuals and entities not party to the Final Settlement Agreement could apply to the industry escrow funds for restitution, the Final Settlement Agreement required applicants for *Stripper Well* refunds to waive their rights to Subpart V refunds. *See id.* ¶¶ III.A.2 & 3. For example, the release in the Refiners Escrow Agreement states that the "Grantor hereby extinguishes, discharges, releases, waives, and abandons all Claims," including

[a]ny claim of Grantor asserting a right to obtain future payment of a share of existing or future monies paid or ordered to be paid based upon or arising out of any Alleged Crude Oil Violation by any Person (whether or not such Person is a Participating Person): (1) in M.D.L. 378, (ii) as a result of any past, pending, or future administrative proceeding in any agency of any State or Federal Government, including DOE, OHA, and the Federal Energy Regulatory Commission (FERC), or (iii) as a result of or for the purpose of satisfying claims of DOE or the United States Department of Justice in any other past, pending, or future

litigation in any State or Federal court....

Release of Claims, Refiners Escrow Agreement ¶ 3 (Plaintiff's Motion for Summary Judgment, Exhibit C) [hereinafter, "Release"].

The form of the Release was modified when the Final Settlement Agreement was revised. The Refiners Escrow Agreement originally stated that

[a] release shall be acceptable for purposes of distribution if and only if (i) it is in the form attached hereto as Attachment A [the Release], (ii) it is executed by a person with authority to do so on behalf of the Person submitting the Release, (iii) it includes a sworn statement by that person that he has such authority....

Refiner's Escrow Agreement ¶ 4. In the Revised Settlement Agreement these formal requirements were relaxed. That agreement "stipulates" that

Each Refiner who executes and delivers a counterpart of this Agreement shall be conclusively deemed and considered for all purposes to have simultaneously executed and delivered the Release as changed by Section 2.1.8 above; and it shall not be necessary or required that a Refiner execute and deliver a separate copy of such Release, notwithstanding any contrary provision of the Original Settlement Agreement or of the Refiners Escrow Agreement.

Revised Settlement Agreement, ¶ 5.3.1 (Plaintiff's Motion for Summary Judgment, Exhibit B).

## II.

In May 1986, two New York City departments, Sanitation and Environmental Protection, applied for *Stripper Well* refunds.[2] Accordingly, Assistant Corporation Counsel Linda Blankenfein signed and submitted to the Refiners Escrow Agent a "Settlement Agreement" on behalf of the Department of Environmental Protection and a "Supplemental Agreement" on behalf of the Department of Sanitation.[3] Both of those agreements incorporated the original *Stripper Well* settlement agreement and the Refiners Escrow Agreement.[4] In executing these agreements, Blankenfein did not actually sign the Refiners Escrow Agreement or the release attached to it, nor did she seek approval from the City Comptroller before signing the agreements.[5]

About a year later, on May 15, 1987, the City's Department of General Services applied for a Subpart V refund on behalf of thirteen mayoral agencies and several independent city agencies. *See* Final Decision at 2. Although the OHA granted the applications of the independent agencies, it denied the application of the Department of General Services. *See* Final Decision at 3–6. The OHA reasoned that because the Departments of Environmental Protection and Sanitation had earlier applied for *Stripper Well* refunds, the affiliates of those departments had waived their rights to Subpart V refunds. *See id.* at 6. The mayoral agencies were affiliated with the Departments of Environmental Protection and Sanitation because all of these agencies are directly controlled by the Mayor of New York. *See id.* The OHA rejected the City's contention that it had not submitted a Release; the agency reasoned that the City must have done so if it received a refund from the Refiners Escrow. *See id.* at 3 & n. 2. The OHA also rejected New York's contention that Linda Blankenfein was unaware that she was waiving $1 million in future claims when she submitted an application for a $5,000 *Stripper Well* refund: The effect of the release in that

---

**2.** *See* Defendants' Statement of Material Facts as to Which There Is No Genuine Dispute ¶ 1 [hereinafter, "Defendants' Statement"]; Plaintiff's Statement of Material Facts as to Which There is No Genuine Dispute ¶ 2 [hereinafter, "Plaintiff's Statement"].

**3.** *See* Defendants' Statement ¶ 1; Plaintiff's Statement ¶ 2. The documents are attached to Plaintiff's Motion for Summary Judgment as Exhibit B.

**4.** *See* Defendants' Statement ¶¶ 1—2; Plaintiff's Statement ¶ 2; Defendants' Response to Plaintiff's Statement ¶ 2.

**5.** *See* Defendants' Response to Plaintiff's Statement ¶¶ 2, 4; Plaintiff's Statement ¶¶ 2, 4.

application, the OHA explained, was plain on its face. *See id.* at 4–5.

### III.

Because the material facts are undisputed, summary judgment may be rendered on the cross-motions. *See* Fed.R.Civ.P. 56(c).

### A.

In its complaint, the City of New York challenged the scope and validity of the Release. First, it argued that the OHA had failed to publish guidelines informing applicants for *Stripper Well* refunds that by applying they would render themselves ineligible for Subpart V refunds. Second, it contended that the waivers in the *Stripper Well* refund applications only applied to the money the DOE had received from the escrow fund in that case and did not preclude application for restitution from money already in the DOE's possession. Finally, the City of New York argued that the Release does not clearly waive the claims of affiliates.

Since the City of New York filed this action, the court with appellate jurisdiction over this matter [6] has rejected these contentions. In *Burlington Ind., Inc. v. Watkins,* 916 F.2d 722 (Temp.Emer.Ct.App. 1990), the Temporary Emergency Court of Appeals found that "the OHA did not fail in any duty to inform Subpart V claimants of the effect of the releases and waivers executed in the *Stripper Well* litigation. As noted above, the releases and waivers were very clear on their face." *Id.* at 724. Furthermore, in *Mid–America Dairymen, Inc. v. Herrington,* 878 F.2d 1448 (Temp. Emer.Ct.App.1989), the Temporary Emergency Court of Appeals ruled that when a party executes a release in connection with an application for a *Stripper Well* refund, "it release[s] *all* of its claims and *all* of the claims of any of its affiliates to any further participation in Subpart V refund proceedings." *Id.* at 1457 (emphasis in original). Accordingly, the City has not contested defendants' motion for summary judgment on

the grounds that the Release could not be used to bar Subpart V refunds or that it was not applicable to the City's application. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment at 1 n. 1.

### B.

■ The City does maintain that Linda Blankenfein did not sign a release on behalf of the City. The City bases this contention upon the undisputed fact that Blankenfein neither signed the Release nor swore that she had authority to execute it. The City argues that it is not bound by the Release because the Refiners Escrow Agreement requires that the Release be signed and a sworn statement of authority attached. *See* Refiners Escrow Agreement ¶ 4. This contention is not persuasive. The Revised Settlement Agreement "stipulates" that anyone who signs that agreement "shall be conclusively deemed and considered for all purposes to have simultaneously executed and delivered the Release." *Id.* ¶ 5.3.1. This stipulation applies "notwithstanding any contrary provision of the Original Settlement Agreement or of the Refiners Escrow Agreement." *Id.* Because Blankenfein signed the Revised Settlement Agreement, it must, therefore, "be conclusively deemed and considered for all purposes" that she executed the Release "notwithstanding" the contrary requirements of the Refiners Escrow Agreement.

The City tries to evade the plain language of the agreements it signed by arguing that as a matter of New York law an oath cannot be "deemed" to have been made. According to the City, an oath "must be in the presence of an officer authorized to administer it, and it must be an unequivocal and present act by which the affiant consciously takes upon himself the obligation of an oath." *Bookman v. New York,* 200 N.Y. 53, 93 N.E. 190, 191 (1910) (citations omitted). There is, how-

---

**6.** Because this action arises under the Economic Stabilization Act and the Emergency Petroleum Act, the Temporary Emergency Court of Appeals has appellate jurisdiction. *See* 12 U.S.C. § 1904 note (1988).

ever, no independent requirement that a representative of the City swear an oath before releasing claims to restitution. Thus, there is no reason for a court to require an oath once the parties have expressly agreed to eliminate that requirement. Simply put, when the City signed the Revised Settlement Agreement, it agreed that only its signature on Revised Settlement Agreement, not on an oath or on the Release, was necessary to effect a waiver of its claims for restitution under Subpart V.

### C.

■ New York City contends that the Release is nonetheless not binding upon it because Linda Blankenfein did not have the authority to waive the City's claims. According to the City, as an Assistant Corporation Counsel, Blankenfein was required to obtain the approval of the Comptroller before waiving claims on behalf of the City. Because she acted beyond the scope of her authority, the City contends that under New York law the release she executed is null and void. *See, e.g., Zanesville v. Mohawk Data Sciences*, 97 A.D.2d 64, 468 N.Y.S.2d 271, 272–73 (N.Y.App.Div.1983); *Lutzken v. Rochester*, 7 A.D.2d 498, 184 N.Y.S.2d 483, 485 (N.Y.App.Div.1959). Defendants do not dispute that the release would be void if Blankenfein lacked the authority to waive the City's claims. Instead, they contend that Blankenfein had such authority. Defendants' contention is not persuasive.

Both parties assume that New York law determines the scope of Blankenfein's authority as an Assistant Corporation Counsel and the effect of any actions she may have taken outside the scope of that authority. The basis for this assumption is not immediately clear. In *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), the Supreme Court held that

When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power.... The authority [to do so] had its origin in the Constitution and the statutes of the

United States and was in no way dependent on the laws [of any State]. The duties imposed upon the United States and the rights acquired by it ... find their roots in the same federal sources. In absence of an Act of Congress it is for the federal courts to fashion the governing law according to their own standards.

*Id.* at 366–67, 63 S.Ct. at 575, *quoted in United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). Applying these principles, the Supreme Court has consistently construed the terms of contracts involving the United States according to what has been called federal common law. *See, e.g., Boyle v. United Technologies Corp.*, 487 U.S. 500, 504–05, 108 S.Ct. 2510, 2513–14, 101 L.Ed.2d 442 (1988); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592–94, 93 S.Ct. 2389, 2396–98, 37 L.Ed.2d 187 (1973). Because the United States was a party to the *Stripper Well* settlement, interpretation of the terms of that agreement, including the terms of the Refiners Escrow Agreement, should be governed by federal common law. The inquiry does not, however, end here. Federal common law normally incorporates relevant state rules unless there is a need for a uniform national rule or the application of a particular state rule would frustrate federal interests. *See Kimbell*, 440 U.S. at 727–29, 99 S.Ct. at 1457–59. In this case, the DOE, the agency entrusted with administering the entitlement programs affected by the *Stripper Well* settlement, has not raised any such objections to the use of New York law. Accordingly, the validity of the release signed by Linda Blankenfein will be interpreted according to New York law.

■ Under that body of law, the release is void. The New York City Charter expressly limits the power of the Corporation Counsel to settle claims for or against the City:

He shall not be empowered to compromise, settle or adjust any rights, claims, demands or causes of action in favor of or against the city, and he shall not permit, offer, or confess judgment against the city, or accept any offer of judgment in favor of the city without the previous

approval of the comptroller, except that with regard to matters involving excise and non-property taxes, such previous written approval shall be obtained from the finance administrator. . . .

New York City Charter § 394(c) (Plaintff's Motion for Summary Judgment, Exhibit G). Conversely, the Charter vests with the Comptroller "the power to settle and adjust all claims in favor of or against the city," with the exception, of course, of the tax matters controlled by the commissioner of finance. *See id.* § 93(g) (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Exhibit A). In the Revised Settlement Agreement, Blankenfein purported to waive any future claims by the City against the Subpart V restitution fund. That waiver was clearly a "compromise, settl[ment], or adjust[ment]" of the City's claim against the restitutionary fund. Because she failed to secure the Comptroller's approval, her actions were *ultra vires,* and, therefore, void under New York law. *See Bush v. O'Brien,* 164 N.Y. 205, 58 N.E. 106 (1900). Moreover, under New York law this conclusion is not affected by the fact that New York City benefited from signing the waiver. *See, e.g., Seif v. Long Beach,* 286 N.Y. 382, 36 N.E.2d 630, 632 (1941); *New York v. New York Telephone Co.,* 108 A.D.2d 372, 489 N.Y.S.2d 474, 476 (N.Y.App.Div. 1985).

Defendants do not dispute that Blankenfein waived a claim of the City's without the approval of the Comptroller. They argue, however, that the Comptroller's approval is not necessary for all settlements. This is clearly true: § 394(c) requires the approval of the finance administrator for the settlement of certain tax claims. There is, however, no indication in the text of the Charter that the Corporation Counsel has any independent authority to settle claims on behalf of the City. Defendants nevertheless contend that two Appellate Division cases have interpolated into the Charter a distinction between equitable and legal claims that allows the Corporation Counsel to settle equitable claims, including claims for restitution, on his or her own initiative. *See Nat Friedman & Son, Inc. v. New York,* 237 A.D. 646, 262 N.Y.S. 584 (N.Y. App.Div.1933), *rev'd on other grounds,* 262 N.Y. 665, 188 N.E. 112 (1933) (per curiam); *Penfield v. New York,* 115 A.D. 502, 101 N.Y.S. 442 (N.Y.App.Div.1906). Neither of these cases, however, addressed the power of the Corporation Counsel to settle the claims. Instead, both cases involved the Charter's requirement that claims against the City be first presented to the Comptroller. *See* City Charter § 261, *reprinted in Penfield,* 115 A.D. at 504–05, 101 N.Y.S. at 443. Without more pertinent and compelling authority, there is no ground for reading an exception into the plain language of the Charter.

Moreover, the reasoning in the cases cited by defendants cannot be extended to cover this case. In *Penfield,* the case on which defendants most heavily rely, the Appellate Division based its distinction between legal and equitable claims upon the particular language of the presentment provision, which provides in pertinent part that

> [n]o action or special proceeding for any cause whatever shall be prosecuted or maintained against the City of New York, unless it shall appear by and as an allegation in the complaint or necessary moving papers that at least thirty days have elapsed since the demand, claim, or claims upon which such action or special proceeding is founded, were presented to the comptroller of said city for adjustment, and that he has neglected to make such adjustment or payment thereof for thirty days after such presentment.

*Id.* In *Penfield,* the Appellate Division observed that while this provision

> refers to any "action or special proceeding for any cause whatever," the latter portion of the section suggests that the reference is really to actions or special proceedings brought to enforce "demands or claims" capable of adjustment or payment by the comptroller, and we much doubt its applicability to a suit on the equity side of the court for relief from wrongful acts in the nature of trespass, which, day by day, cause injury and damage to the complainant.

*Penfield*, 115 A.D. at 505, 101 N.Y.S. at 443 (citations omitted). Thus, the *Penfield* court's conclusion that equitable claims need not be presented to the Comptroller was based upon a close reading of the presentment clause. The language of § 394(c) is, however, significantly different. That section refers to "rights, claims, demands, or cause of actions," which are presumably broader than the presentment provision's "actions or special proceedings." More fundamentally, while the *Penfield* court gave great weight to the fact that the "latter portion" of the presentment provision referred to the Comptroller's power of adjustment, § 394(c) does not contain any reference to the Comptroller's ability to "adjust" claims. Given the very different language in the presentment provision and in § 394(c)'s limitation of the Corporation Counsel's power to settle claims, there is no reason to apply the equitable limitation upon the Comptroller's presentment powers recognized in *Penfield* to the Comptroller's right to approve all claims on behalf of or against the City.

*Friedman* might be read to stand for a principle of broader applicability than *Penfield*. In that case, the Appellate Division held that it was not necessary to present a quiet title action to the Comptroller because "[n]o equitable powers are vested in the comptroller and it would be an idle ceremony to present to him for adjustment a matter of this nature." *Nat Friedman*, 262 N.Y.S. at 585. Defendants argue by analogy that the Comptroller's approval is not needed for claims against the Subpart V restitutionary fund because restitution is, like quieting title, an equitable remedy. *See United States v. Sutton*, 795 F.2d 1040, 1061 (Temp.Emer.Ct.App.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). The more natural reading of the passage, however, is that, rather than rely upon the often artificial distinction between law and equity, the Appellate Division adopted a common sense approach. The Comptroller's primary power under the Charter is control of the City's finances. *See* New York City Charter § 93. Because the City's finances are not directly affected by a suit to quiet title, the

Comptroller has little interest in the resolution of such a suit. Where, however, a decision by the Corporation Counsel potentially waives more than $1 million, it would not be "idle ceremony" to consult the Comptroller. In fact, if the Corporation Counsel could settle any claim properly labeled as equitable, he could commit city funds to pay for claims of restitution against the City without the Comptroller's approval—precisely the eventuality that Charter sections 93(g) and 394(c) were designed to prevent.

■ To summarize, the plain language of the New York City Charter vests with the Comptroller the authority to approve or disapprove of all settlements of claims on behalf of or against the City. While defendants argue that there is an implicit exception for equitable claims, they have cited no direct authority construing the relevant provision. Moreover, although they point to an equitable exception in the presentment clause, the rationales put forward in the two cases the defendants cite do not suggest that the Corporation Counsel should be able to waive millions of dollars in potential claims for restitution on his own authority. As a consequence, when Linda Blankenfein signed the Revised Settlement Agreement without the Comptroller's approval, she did not have the authority to release the City's claims for Subpart V refunds. Under New York law, her actions were, therefore, *ultra vires*, and the waiver she executed is null and void.

### IV.

Accordingly, an accompanying order will deny defendants' motion for summary judgment, grant plaintiff's motion for summary judgment, and remand this matter to the Department of Energy for further consideration.

### ORDER

For the reasons stated in the accompanying memorandum, it is this 7th day of February, 1991, hereby

ORDERED: that Plaintiff City of New York's Motion for Summary Judgment

should be, and is hereby, granted; and it is further

ORDERED: that Defendants' Motion for Summary Judgment should be, and is hereby, denied; and it is further

ORDERED: that this matter shall be remanded to the Department of Energy's Office of Hearing and Appeals for further consideration.